172 Pa. Superior Ct. 152 (1952)
Commonwealth, Appellant,
v.
Franklin.
Superior Court of Pennsylvania.
Argued October 7, 1952.
November 12, 1952.
Before RHODES, P.J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.
Thomas M. Reed, Assistant District Attorney, with him Samuel Dash, Assistant District Attorney, Michael von Moschizisker, First Assistant District Attorney, Malcolm Berkowitz, Assistant District Attorney, and Richardson Dilworth, District Attorney, for appellant.
William J. Woolston and Raymond Pace Alexander, for appellee.
Herman I. Pollock, Voluntary Defender, amicus curiae, in propria persona.
William Allen Rahill and Julian E. Goldberg, filed a brief, for American Civil Liberties Union, amicus curiae.
The facts are stated in the opinion by MILNER, J., of the court below, as follows:
There is before us for consideration a rule granted upon the district attorney to show cause why a recognizance demanded of the petitioner should not be quashed and discharged.
It is stated in the amended petition that Edward J. Franklin, the petitioner, was indicted for assault and battery and for unlawfully resisting arrest, as of December Term, 1950, No. 347, in the Court of Quarter Sessions of the Peace for Philadelphia County. The matter came on for trial before a judge and jury and the petitioner was found not guilty. The trial judge, nevertheless, thereupon ordered that the defendant be "held in $1,000.00 bail to keep the peace for a period of two (2) years. Defendant permitted to sign own bond," and the order was duly endorsed upon the bill of indictment upon which petitioner had been acquitted. The petitioner that day entered bail so that he would not be committed for failure to enter such bond.
*153 The amended petition sets forth, and the district attorney has not controverted, that "neither the Commonwealth nor others had produced evidence upon which there could be found that the defendant had a previous criminal record or had been previously indicted for offenses other than those on which he had been that day acquitted, or that the defendant had the reputation of being a dangerous character in any respect, or that petitioner was `not of good fame.'" We have examined the record of the trial of defendant Franklin and can find no evidence that he had a reputation of being a dangerous character in any respect or that he was not of good fame. The petitioner contends that the trial judge did not have the power or authority to order him held in such bail; that the "order was without factual or legal justification"; and that the order is in contravention of petitioner's rights under the 13th and 14th amendments to the Constitution of the United States and of Article I, Sections 9, 10 and 13, of the Pennsylvania Constitution.
Because we are aware that many judges in this state have exercised a similar power to that which we are now called upon to subject to inquiry, and because we regard the matter as involving fundamental civil rights, we shall undertake an extended review of the authority upon which the power to bind after acquittal is alleged to rest. Preliminary we must limit our inquiry by noting that we are not here concerned with the admitted common-law power of a judge to impose as part of a sentence, after conviction, a requirement that a defendant enter security for his good behavior. Nor are we considering the statutory peace bond which may be required of a defendant upon complaint of a third person that such defendant has threatened the person or property of the complainant: see Act of March 31, 1860, P.L. 427, section 6, 19 P.S. 23, *154 and see also Acts of March 18, 1909, P.L. 42, 19 P.S. 24-26, April 27, 1909, P.L. 260, 19 P.S. 27-28, and see I Edw. III, Stat. 2, c 16 (1327). We are here concerned only with the assertion that a trial judge, following a trial resulting in an acquittal of the accused, may require such defendant to post such security, to assure his good behavior, as the trial judge shall, in his discretion, direct and for such period of time as such judge may in his discretion direct.[1]
In undertaking this inquiry into the legality of the asserted authority we are aware of the fact that our Supreme Court over a century ago would seem to have already passed upon and confirmed the existence of such power. In such circumstance there would ordinarily remain nothing further for consideration by a lower court but compliance with the law as pronounced by the highest tribunal of this Commonwealth. But, as we shall hereinafter indicate at greater length, none of the judicial authorities relied upon is of even comparatively recent date and there are raised in this proceeding, for the first time,[2] constitutional questions of grave import. In the circumstances, we are bound to consider the impact of the adoption of the Fourteenth *155 Amendment to the United States Constitution upon the statutes of this Commonwealth. We have been unable to find any binding authority in this Commonwealth, or, indeed, in any of our sister states, which considered the validity of the ancient English statute of 34 Edw. III, c. 1, in the light of modern constitutional concepts. In Quong Wing v. Kirkendall, 223 U.S. 59, 64 (1912), Mr. Justice HOLMES stated, "Laws frequently are enforced which the court recognizes as possibly or probably invalid if attacked by a different interest or in a different way."
From our survey we have been unable to find any other state in our Union in which it is maintained that a defendant acquitted in a criminal trial can be held under bond to keep the peace. Yet the practice has persisted for many years in Philadelphia County. The Public Defender, in his excellent brief as amicus curiae, states that the Report of the Board of Inspectors of the Philadelphia County Prison for the years 1939 to 1949 indicates that in that period 478 men, after acquittal of criminal charges, were compelled to serve an aggregate of over 600 years in the Philadelphia County Prison in default of bonds aggregating $613,200. Hundreds of defendants, acquitted by juries of their peers, have been placed under the restriction of a bond to keep the peace and many who have been unable to furnish bond or have failed to enter their recognizance have languished in jail and some are now in jail as a result of this practice. The authority for this practice is said to lie in an old English Statute adopted six centuries ago. In the first place we believe, from our review of the history of the Statute of 34 Edward III, that neither it nor the cases relating to it, including the Bamber case decided by our Supreme Court over a century ago, justify the practice, and that in any event, since the adoption of the Fourteenth *156 Amendment to the Constitution of the United States in 1868, and the adoption of the present Constitution of Pennsylvania in 1873, the practice is contrary to our fundamental law, is against common sense and an enlightened sense of justice, and is indefensible.
The Fourteenth Amendment to the Federal Constitution declares that no state shall deprive any person of life, liberty or property without due process of law. This amendment is a limitation on the powers of the states (12 Am. Jur., Const. Law, Sect. 567, p. 258). In the chapter on Constitutional Law in American Jurisprudence in Section 573, it is stated: "The essential elements of due process of law are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause. One of the most famous and perhaps the most often quoted definition of due process of law is that of Daniel Webster in his argument in the Dartmouth College Case, in which he declared that by due process of law is meant `a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial.' Somewhat similar is the statement that it is a rule as old as the law that no one shall be personally bound until he has had his day in court, by which is meant until he has been duly cited to appear and has been afforded an opportunity to be heard. Judgment without such citation and opportunity lacks all the attributes of a judicial determination; it is judicial usurpation and oppression and can never be upheld where justice is fairly administered."
Article I, Sec. 9 of the Constitution of Pennsylvania provides: "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have *157 compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land."
In the case before us the petitioner was held under bond to keep the peace without any information or complaint lodged against him charging him with any offense mentioned in the Statute of 34 Edward III, which is set forth later on in this opinion. He was indicted for assault and battery and found not guilty. He had no notice that he might be accused of being a person "not of good fame," or of any other charge which could result in the restraint of his liberty or freedom. Without a trial by a jury of his peers he found himself adjudged guilty by a judge upon a suspicion of what he might do, and was placed under bond. This restriction was a punishment and deprivation of his rights without due process of law.
The argument has been made here that the practice which we condemn existed at common law in England and in the early days of this Commonwealth. We have said that we do not concede there is good authority for the practice in the early common law, but in any event this argument is answered in American Jurisprudence, Constitutional Law, at Section 580, as follows: "The fact that one of the tests of due process is the common law as it existed at the time of the establishment of our civil and political institutions does not prevent a change in the law as it then existed. There is no constitutional right to have all general propositions of law once adopted remain unchanged. It is not to be inferred that all modes of procedure which do not have the sanction of this early law are to be *158 condemned. Nor can it be said that every form of procedure settled in English law at the time of the emigration to America and brought to this country and practiced by the early colonists is an essential element of due process of law. It has been pertinently remarked that if this were so, the procedure of the first half of the seventeenth century would be fastened upon American jurisprudence like a strait jacket, only to be unloosened by constitutional amendment, and that it would be to deny every quality of the law but its age and to render it incapable of progress or improvement. The guaranty of due process demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." (The excerpts from American Jurisprudence are fortified by a host of decisions of the Supreme Court of the United States, and the appellate courts of this and other states, referred to in the notes to the above mentioned sections.)
We have concluded that there is no valid authority under the law as it exists today to place the petitioner under bond. He was acquitted of the charge lodged against him and he is entitled to his complete freedom, unfettered by any bond or restriction.
Because of the importance of this and the fact that the practice we condemn has apparently been accepted and followed without adequate examination into its legitimacy, we are obliged to re-examine the subject at some length.
The first reported Pennsylvania case which we have found which approved the requirement that defendants post bond after and despite their acquittal, was Respublica v. Patrick Donagan, 2 Yeates 436 (1799). In that case Patrick Donagan and Francis Cox, the defendants, were charged as accessories before the fact *159 to murder and were found not guilty. The court ordered each to "give security to keep the peace, and be of good behaviour to all the liege citizens of the United States, and in particular to Peter Shitz, for the term of fourteen years, each in the sum of 10,000 dollars, and two good sureties in 10,000 dollars each."
The report states that "There was strong reason to believe that the prisoners had been concerned in a most horrid murder, though there was not sufficient evidence to convict them of the crime. The court directed them to give the above security, under the firm opinion, that they were persons of most dangerous character, and not being able to give the security, they had remained in gaol."
On a motion for their enlargment it was contended that the orders operated as life sentences; that the constitution forbade requirement of excessive bail, imposition of excessive fines or imposition of cruel punishments. The motion was denied per curiam on the statement that "The court before whom the trial was had, under their general authority to preserve the peace, had a right to require such bail and for such a length of time, as they judged would best answer the ends of public justice. No doubt can be entertained of it. And it would be highly improper for us to interfere, in a matter wherein they have exercised their legal discretion. Unsafe would the community be, if such characters could prowl at large through the country, without a sufficient tie on them." By footnote, reference was made, not by the court, but by the editor, to the following English authorities, viz: "Surety for the good behaviour ordered by the court after acquittal. Comb. 40. 2 Hawk. 442.[3] One may be bound *160 with sureties for his good behaviour even during life. Cro. Car. 332, 378. 2 Stra. 834. 1 Hawk. 106, 129. Surety of the peace may be demanded for any number of years that the public safety requires. It is discretionary in the court. 1 Term Rep. 700."
A note following the opinion states, "The prisoners afterwards broke gaol and escaped."
Apparently the next case to arise in this Commonwealth was Respublica v. William Cobbet, 3 Yeates 91 (1800), where the defendant caused publication of certain allegedly slanderous words as to the governments and officers of the United States and this Commonwealth. A recognizance in stated amounts was taken by Thomas McKean, the then chief justice "`conditioned, that if the above bounden William Cobbet, shall be of good behaviour towards the aforesaid commonwealth, and all the liege people until the next Court . . . then the said recognizance to be void, otherwise to remain in force.'" The proceeding was in debt on forfeited recognizance for good behaviour. Although there was reference to the statute of 34 Edw. III, c. 1 and the right to require surety prior to conviction there is nothing to indicate that such binding to good behavior followed an acquittal. It would seem that the action must have originated on complaint of some third person, a procedure not here challenged.
The next[4] and perhaps most important Pennsylvania case was Bamber v. The Commonwealth, 10 Pa. 339 (1849), in which two defendants were indicted for burglaries and acquitted in the Court of Quarter Sessions of Philadelphia. The following order was then *161 recorded, "And now, & c., from the evidence presented to the court in the trial of this cause, the court order that defendant, & c., give bail in the sum of $5,000 to keep the peace and be of good behaviour to all good citizens of this commonwealth for the term of one year each; and that they stand committed until this order is complied with." The judgment was affirmed per curiam without opinion and the reported proceeding indicates that both Coulter, J. and Rogers, J. relied on the vague assumption that such power was said to have hitherto been undoubted. Counsel for the appellant argued as follows, "The order is, to find surety of the peace and for good behaviour. The former is under the Act of 1700, and can only be on the oath of one that he goeth in bodily fear of another. The latter is founded on 34 Ed. 3, c. 1, and ought to be conditioned for the party's appearance to answer, otherwise what becomes of the provision in Mag. Ch. Nullus liber homo capiatur vel imprisonetur . . . nisi per legale judicium parium suorum vel per legem terrae:[5] 2 Hale, 136; 2 B. & Ald. 288 [Willes v. Bridger, 106 Eng. Rep. 368, K.B. 1819]. Though it is true the justices have discretionary power to require surety, their discretion is to be exercised according to the law of the land, and not by their private notions: 5 Rep. 100b; 2 Vent. 22; 14 East, 64; Vaugh. 137; 1 Ash. 140."
Counsel for the Commonwealth contended that the Donagan case in 2 Yeates 436 foreclosed the question as to discretionary power to hold to bail for good behaviour, even after acquittal and recited a practice of doing so. Reference was made to 34 Edw. III, c. 1 for authority; that it was in force in this state: 3 Bin. 612; and that it gave discretionary power to a magistrate *162 to take surety from all those whom he has just cause to suspect to be dangerous: 1 Hawk. P.C., Ch. 61, s. 4. The following is stated in the report of argument (page 340): "These are instances (i.e. the "just cause") where defendants acquitted against plain evidence of felonies and other enormous crimes, have been bound to their good behaviour: 2 Hawk. B. 2, ch. 47, s. 11; 2 Hale P.C. 136, in note, Am. edition, 1847. Here, the record shows the court below demanded surety on `evidence presented' on a trial. Even at common law, a man might be bound to good behaviour if it were testified he was of ill fame, and be committed till he finds sureties: 2 Hale P.C. 394. Surety for good behaviour, even when defendant is not bound to answer, may be demanded: 1 Bin. 98, n. The cases cited on the other side are cases of `surety of the peace,' which differs from surety for good behaviour, though the latter includes the former. 1 T.R. 696, was surety of the peace proper, and the point held was, that there might be a binding over for more than a year. 12 Ad. & Ellis, 599, was also surety of the peace. By the act of 1700 (Purdon, 1083), previous oath in surety of peace is required: no such necessity in surety for good behaviour. In 1 Ash. 140, it was held that an indefinite binding over to keep the peace and be of good behaviour, could not be enforced in a matter of private wrong. Surety for good behaviour includes surety for the peace, and something more. 4 Bl. Com. 256. A justice may bind over night-walkers, such as keep suspicious company, or are reported to be pilferers and robbers, and other persons `whose misbehaviour may reasonably bring them within the general words of the statute, as persons not of good fame; an expression, it must be owned, of so great latitude as leaves much to be determined by the discretion of the magistrate himself: 4 Bl. Com. 256, 257. A fortiori may a judge *163 who, by `evidence presented,' is satisfied that a man is not of good fame, and likely to endanger the public peace, demand surety for good behaviour. Like all other discretionary powers, it should be used cautiously."
It is apparent that the sole authorities relied upon by our cases in the Statute of 34 Edw. III, c. 1, and certain English cases and text writers which we shall discuss later. In the Report of the Judges of the Supreme Court as to which English Statutes are to be deemed in force in Pennsylvania[6] and which should be incorporated into the statute laws of this Commonwealth (3 Binney Rep. 595, et seq., at page 612; Robert's Digest of British Statutes, 349), it was indicated that "those parts only of this statute are in force, which are distinguished by the numbers 2, 3, 4, 5, 6 and 10" and it was recommended that the statute be incorporated.
The Statute of 34 Edw. III, c. 1, enacted in 1360, is as follows:[7] ("These be the Things which our Lord the King, the Prelates, Lords, and the Commons have ordained in this present Parliament holden at Westminster, the Sunday next before the Feast of the Conversion of St. Paul, to be holden and published openly through the Realm.")
Chapter 1. ("What sort of persons shall be Justices of Peace; and what authority they shall have.")
1. ("That in every County of England shall be assigned for the keeping of the peace, one Lord, and with him three or four of the most worthy in the County, with some learned in the law";)
*164 2. "And they shall have power to restrain the offenders, rioters, and all other barators, and to pursue, arrest, take, and chastise them according to their trespass or offense";
3. "And to cause them to be imprisoned and duly punished according to the law and customs of the Realm, and according to that which to them shall seem best to do by their discretion and good advisement";
4. "And also to inform them, and to inquire of all those that have been pillors and robbers in parts beyond the sea, and be now come again, and go wandring, and will not labor as they wont in times past";
5. "And to take and arrest all those that they may find by indictment, or by suspicion, and to put them in prison";
6. "And to take of all them that be not of good fame, where they shall be found, sufficient surety and mainprise of their good behaviour towards the King and his People, and the other duly to punish, to the intent that the people be not by such rioters or rebels troubled nor endamaged, nor the peace blemished, nor merchants nor other passing by the Highways of the Realm disturbed, nor put in the peril which may happen of such offenders."
7. ("And also to hear and determine at the King's suit all manner of felonies and trespasses done in the same county according to the laws and customs aforesaid";)
8. ("And that Writs of Oyer and Determiner be granted according to the Statutes thereof made, and that the Justices which shall be thereto assigned be named by the Court, and not by the Party.")
9. ("And the King will, that all general inquiries before this Time granted within any Seigniories for the mischiefs and oppressions which have been done to the *165 people by such inquiries, shall cease utterly and be repealed";)
10. "And that fines, which are to be made before justices for a trespass done by any person, be reasonable and just, having regard to the quantity of the trespass and the causes for which they be made."
A reading of this statute nowhere indicates that a bond may be required of an accused following his trial and acquittal. Yet the power is traced to and said to be derived from paragraph 6 of this act which provided for the taking from "them that be not of good fame . . . sufficient surety and mainprise of their good behaviour." A study of the subject matter indicates that the so-called "historical" basis for requiring the posting of a bond to keep the peace after acquittal is little more than bald assumption coupled with unsupported statements by legal writers based on cloudy old English cases whose very authority is left doubtful by subsequent English cases.
In 4 Blackstone 256 no reference is made to the specific question of whether a defendant may be required to post a bond for good behavior after acquittal, but reference over is made to 1 Hawkins, P.C. 132-133 where such authority is assumed. Blackstone first discusses the distinction between recognizances for the peace (what we refer to in this opinion as statutory peace bonds based on complaint and hearing) and for good behavior. He observes that a recognizance for good behavior "includes security for the peace, and somewhat more" and proceeds as follows: "1. First, then, the justices are empowered, by the statute 34 Edw. III. c. 1, to bind over to the good behavior towards the king and his people all them that be not of good fame, wherever they be found; to the intent that the people be not troubled nor endamaged, nor the *166 peace diminished, nor merchants and others, passing by the highways of the realm, be disturbed nor put in the peril which may happen by such offenders. Under the general words of this expression, that be not of good fame, it is holden that a man may be bound to his good behavior for causes of scandal, contra bonos mores, as well as contra pacem; as, for haunting bawdy-houses with women of bad fame, or for keeping such women in his own house; or for words tending to scandalize the government, or in abuse of the officers of justice, especially in the execution of their office. Thus also a justice may bind over all night-walkers; eaves-droppers; such as keep suspicious company, or are reported to be pilferers or robbers; such as sleep in the day and wake in the night; common drunkards; whoremasters; the putative fathers of bastards; cheats; idle vagabonds; and other persons whose misbehavior may reasonably bring them within the general words of the statutes as persons not of good fame: and expression, it must be owned, of so great a latitude as to leave much to be determined by the discretion of the magistrate himself. But if he commits a man for want of sureties, he must express the cause thereof with convenient certainty, and take care that such cause be a good one."
In 2 Hawkins, P.C., chapt. 47, section 11, page 623 (8th Ed. 1824) Hawkins stated: "That it hath been adjudged, that if the jury acquit a prisoner of an indictment of felony against manifest evidence, the court may, before the verdict is recorded, but not after, order them to go out again and reconsider the matter; but this is by many thought hard, and seems not of late years to have been so frequently practised as formerly. Also there are instances where defendants acquitted against plain evidence, of felonies and other enormous crimes, have been bound to their good behaviour."
*167 For this latter assertion, which is the point we are considering, Hawkins refers to three cases:[8]Hopestill Tyndal's Case, Cro. Car. 291, 79 Eng. Rep. 855 (1633); Evans and Cottington's Case, Cro. Car. 507,[9] 79 Eng. Rep. 1037 (1639); and 2 St. Tr. 60. The latter two cases we may well disregard since in both of them the power to punish was apparently based on the fact that the defendants were found guilty of contempt of court committed during the course of their respective trials. In the case of Evans and Cottington nine persons were indicted for grand riot and five of them were adjudged not guilty; as to three of them there was evidence of riot committed near the court. Hawkins indicates that the bond required was based on this contempt of court and this conclusion is strengthened by the fact that Justice CROKE expressed no dissent as he did in the Hopestill Tyndal case.
The only authority remaining upon which Hawkins relied is Hopestill Tyndal's Case, Cro. Car. 291, 79 Eng. Rep. 855 (1633), decided by an evenly divided court[10] of four Judges of the Court of King's Bench. The entire report of this case, together with the editor's footnotes, as it appears in the English Reprint is as *168 follows: "The prisoner challenged one of the jurors, being the foreman, who was sworn, and marked sworn by the clerk, before the challenge was heard by the Court; and therefore without the assent of the Attorney General, then present, they would not alter the record; and because he would not assent to alter the record, the challenge was disallowed.
"And afterwards, upon evidence at the Bar, divers witnesses were produced by the defendant, which were heard without oath (1 Ann. c. 9 witnesses in behalf of a prisoner shall not be sworn. 2 Blackst. 147; 2 Hawk. ch. 46. s. 29. and the cases there cited. 4 Bl. Com. 353), but some of them witnessing matter which the Attorney General conceived would make for the King, were upon the desire of the said attorney sworn, and after ordered upon their said oath to deliver their knowledge.
"The prisoner was afterward acquitted: but because the evidence (if it had been believed by the jury) was very strong against the prisoner, RICHARDSON, Chief Justice, and JONES appointed, that the prisoner should be bound to his good behaviour; whereupon, against the opinion of myself [Justice CROKE] and Justice BERKLEY, he was so bound."
Perhaps the most significant aspect of this opinion is that the statute of 34 Edward III, c. 1 is not cited as its authority; nor is there any reference to previous judicial precedents as there was on the point of taking the oath of witnesses.
In Rex v. Sir John Knight, Comberbach 38, 39, 40, 90 Eng. Rep. 330, 331 (1687), cited in the Donagan case, the report lacks clarity and detail, but it would seem that the defendant was bound to good behavior after acquittal. The report indicates that an information was lodged "for going to church with pistols, etc. contra stat. 2 Ed. 3, . . ." and continued: "C.J. This *169 offence had been much greater, and better laid at common law. But tho' this statute be almost gone in desuetudinem, yet where the crime shall appear to be malo animo, it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security); but afterwards he was found, not guilty."
Subsequently, and separated from the above report by the reports of several other cases, there appears at page 40 the following: "One acquitted, yet bound to good behaviour. Moved per Attorney-General, that the defendant, tho' found not guilty, may be bound to the good behaviour, according to Jordan's case. And it was ordered accordingly per Cur'."
It is difficult to understand several aspects of this case. The separation of the two segments of the case is unexplained. It is not clear whether the proceeding involves a complaint by a third party or not; the procedure by information rather than by indictment is not explained. No report has been found of any pertinent "Jordan's case" and we note that no reference is made to the statute of 34 Edward III, c. 1, though the prosecution was itself apparently based on an earlier statute of Edward III.
In reviewing texts and cases the following English cases are variously referred to as possible precedents for requiring a bond after acquittal: Rex v. Woolston, 2 Strange 834, 93 Eng. Rep. 881-2 (2 Geo. 3, 1729); Martyn Page's Case, Cro. Car. 332, 79 Eng. Rep. 890-1 (9 Car. 1, 1634); The King v. Andrew Robinson Bowes, 1 Term Rep. 696, 99 Eng. Rep. 1327-1330 (1787); Holmes's Case, Cro. Car. 378, 79 Eng. Rep. 928 (10 Car. 1, 1635). None of these cases is in point.[11]
*170 In the Woolston case defendant was convicted "on four informations for blasphemous discourses on the miracles of our Saviour." The court refused to entertain debate whether the offense was punishable at common law. The defendant was "fined 25/ for each of his four discourses, to suffer a year's imprisonment, and to enter into a recognizance for his good behaviour during his life, himself in 3000/ and 2000/ by others." There was no acquittal and the case is not pertinent to our inquiry.
In the Martyn Page case, the defendant was acquitted, by a jury, of rape upon a 10 year child because of lack of evidence of penetration and the judges who heard the evidence caused an indictment for battery to be preferred and found. Defendant was "committed to prison, there to abide during the King's pleasure, to be fined two hundred marks, to stand upon the pillory in Chancery-lane, in Middlesex, near the place where the fact was committed, with a paper upon his head signifying the cause, and to be bound with able sureties to the good behaviour during life." This case also did not involve the posting of security after acquittal.
In the Bowes case the court engaged in a lengthy discussion of the power of the court to require bail for longer than a year and in considerable sums but no issue of bond after acquittal was involved; the action was initiated on a complaint by the defendant's wife to have him enter security, a proceeding now *171 governed by the Acts of 1860 and 1909 in Pennsylvania.
In contrast to the foregoing, reference may be made to Rex v. Holt, 7 Car. & P. 518, 524, 173 Eng. Rep. 229, 232 (1836) wherein LITTLEDALE, J., refused a request that he detain an acquitted defendant until articles of peace were prepared. Justice LITTLEDALE stated: "When a verdict of Not guilty is found, and the Grand Jury are discharged, the prisoner is entitled to be discharged immediately."
In The Queen v. Dunn, 4 Per. & Dav. 437 (1840) after the defendant was discharged on articles of peace exhibited, the Attorney General moved that the defendant be bound for good behaviour, LORD DENMAN, a distinguished common law judge, in denying that motion, stated (page 438): "We think it must be taken that our judgment disposes of the whole matter up to the present time."
On pages 434-435 LORD DENMAN states: "The power of the justices of the peace in this behalf is traced to a statute of Edw. 3, which was made the foundation of the commission of the peace, though some have thought that it did not warrant the crown in granting so large an authority. We cannot question the validity of the commission, which has been in operation for centuries; but the justices of the peace on the other hand cannot give themselves jurisdiction in any case. They cannot go beyond the terms and fair meaning of the commission. . . . The fair meaning is, that if one person informs the court or a justice of the peace that he goes in fear and in danger of personal violence from another, by reason of threats employed by him, and prays the protection of sureties of the peace, that protection may be granted. Unless such a case appear, no jurisdiction appears; nor can we ever infer facts necessary to give jurisdiction from the mere circumstance *172 of an inferior court assuming to act as if they possessed it; least of all where, by the exercise of a discretionary power on an ex parte statement, which is not allowed to be contradicted, a single magistrate may deprive the subject of his personal freedom. An opportunity must therefore be given for arguing the validity of the act done by the sessions or magistrate, and, unless this may be done by means of the writ of certiorari, it could never be done at all where the gaoler makes a general return to the habeas corpus."
We have made extended reference to the cases in England and in this Commonwealth to show the dubious case basis on which there has been erected the present supposition that a defendant despite acquittal by a jury of his peers may nevertheless be bound over for his good behavior and, in default of the entry of the designated security, be forthwith imprisoned until such security be entered.
We turn now to a consideration of the petitioner's contention that the court's order and the statute which purportedly supplies its authority is in contravention of the petitioner's rights under the federal and the state constitutions. We are of the firm opinion that the statute is, on its face, under the decided cases and as administered, fatally defective because of vagueness; that because of such vagueness it contravenes Article III, Section 1 of The Constitution of Pennsylvania as an improper delegation of legislative power to the judiciary. Further and concomitantly the guide "not of good fame" which is the trigger mechanism for invocation of the statutory power to require a bond for good behavior is defectively vague and fails to provide any reasonably accurate ascertainable standard of guilt or to give reasonable notice of the conduct it purports to proscribe, contrary to the due process clause of the 14th Amendment to the United States *173 Constitution and contrary to the requirement of due process in Article 1, sections 1 and 9 of the Constitution of this Commonwealth.
The Act of 34 Edw. III, c. 1, authorizes justices of the peace[12] to "take of all them that be not of good fame . . . sufficient surety . . . of their good behaviour. . . to the intent that the people be not by such rioters or rebels troubled nor endamaged, nor the peace blemished, nor merchants nor other passing by the Highways of the Realm disturbed, nor put in the peril which may happen of such offenders." The language of this section as well as that of the other sections quoted above is obviously addressed to a particular and peculiar situation then confronting the people of England in 1360. If we were to regard the statute as limited to the dangers engendered by "rioters or rebels" it is obvious that the statute would be essentially inappropriate and of little consequence to the circumstances of our people. However, the significant words which have been judicially seized upon for the exercise of power in particular cases wherein judges have felt the juries went awry, are the words "them that be not of good fame." Is this a standard? We think not.
The Supreme Court of the United States has on frequent occasion considered the question of statutory vagueness. In Connally v. General Construction Co., 269 U.S. 385 (1925) the Supreme Court of the United States considered an Oklahoma statute which imposed severe penalties upon contractors who paid their workmen less than the "current of per diem wages in the locality where the work is performed . . ." Mr. Justice *174 SUTHERLAND speaking for the court stated (pages 391-392): "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. International Harvester Co. v. Kentucky, 234 U.S. 216, 221; Collins v. Kentucky, 234 U.S. 634, 638.
"The question whether given legislative enactments have been thus wanting in certainty has frequently been before this court. In some of the cases the statutes involved were upheld; in others, declared invalid. The precise point of differentiation in some instances is not easy of statement. But it will be enough for present purposes to say generally that the decisions of the court upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502; Omaechevarria v. Idaho, 246 U.S. 343, 348, or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, Nash v. United States, 229 U.S. 373, 376; International Harvester Co. v. Kentucky, supra, p. 223, or, as broadly stated by Mr. Chief Justice WHITE in United States v. Cohen Grocery Co., 255 U.S. 81, 92, `that, for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort *175 was afforded.' See also Waters-Pierce Oil Co. v. Texas (No. 1), 212 U.S. 86, 108. Illustrative cases on the other hand are International Harvester Co. v. Kentucky, supra, Collins v. Kentucky, supra, and United States v. Cohen Grocery Co., supra, and cases there cited. The Cohen Grocery Case involved the validity of § 4 of the Food Control Act of 1917, which imposed a penalty upon any person who should make `any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries.' It was held that these words fixed no ascertainable standard of guilt, in that they forbade no specific or definite act."
The Court quoted with approval at pages 392-393 the following from United States v. Capital Traction Co., 34 App. D.C. 592, 596, 598 (1910): "`The statute makes it a criminal offense for the street railway companies in the District of Columbia to run an insufficient number of cars to accommodate persons desiring passage thereon, without crowding the same. What shall be the guide to the court or jury in ascertaining what constitutes a crowded car? What may be regarded as a crowded car by one jury may not be so considered by another. What shall constitute a sufficient number of cars in the opinion of one judge may be regarded as insufficient by another. . . . There is a total absence of any definition of what shall constitute a crowded car. This important element cannot be left to conjecture, or be supplied by either the court or the jury. It is of the very essence of the law itself, and without it the statute is too indefinite and uncertain to support an information or indictment.
`. . . The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will *176 reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such double meaning that the citizen may act upon the one conception of its requirements and the courts upon another.'"
The opinion of the court concluded (page 395): "The result is that the application of the law depends not upon a word of fixed meaning in itself, or one made definite by statutory or judicial definition, or by the context or other legitimate aid to its construction, but upon the probably varying impressions of juries as to whether given areas are or are not to be included within particular localities. The constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal."
In Lanzetta v. New Jersey, 306 U.S. 451 (1938) there was under consideration a statute which provided, "Any person not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime . . . is declared to be a gangster . . ." and imposed severe penalties. The court discussed at length the word "gang" employed in the statute and stated that it had no "meaning derivable from the common law, for neither in that field nor anywhere in the language of the law is there definition of the word" (page 455) and concluded "The challenged provision condemns no act or omission; the terms it employs to indicate what it purports to denounce are so vague, indefinite and uncertain that it *177 must be condemned as repugnant to the due process clause of the Fourteenth Amendment." See Champlin Rfg. Co. v. Commission, 286 U.S. 210, 242, 243 (1932); Cline v. Frink Dairy Co., 274 U.S. 445, 458 (1927); Small Co. v. American Sugar Rfg. Co., 267 U.S. 233, 239, (1925); Nash v. United States, 229 U.S. 373 (1913). See the discussions in Winters v. New York, 333 U.S. 507 (1948); Jordan v. DeGeorge, 341 U.S. 223 (1951) especially Justice JACKSON'S dissenting opinion joined in by Mr. Justice BLACK and Mr. Justice FRANKFURTER; Edmond N. Cahn, Authority and Responsibility, 51 Col. L.R. 838 (Nov. 1951); Musser v. Utah, 333 U.S. 95 (1948); People v. Belcastro, 356 Ill. 144, 190 N.E. 301 (1934); People v. Licavoli, 264 Mich. 643, 250 N.W. 520 (1933); Ralph W. Aigler, Legislation in Vague or General Terms, 21 Mich. L. Rev. 831 (1923); Vernon L. Wilkinson, The Federal Bill of Rights and Fourteenth Amendment, 26 Geo. L.J. 439 (1938).
In State v. Partlow, 91 N.C. 550, 553 (1884), Judge MERRIMON stated, "But a statute must be capable of construction and interpretation; otherwise it will be inoperative and void. The court must use every authorized means to ascertain and give it an intelligible meaning; but if after such effort it is found to be impossible to solve the doubt and dispel the obscurity, if no judicial certainty can be settled upon as to the meaning, the court is not at liberty to supply, to make one. The court may not allow `conjectural interpretation to usurp the place of judicial exposition.' There must be a competent and efficient expression of the legislative will. In Drake v. Drake, [15 N.C. 110 (1833)] Chief Justice RUFFIN said: `Whether a statute be a public or private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, *178 either ministerially or judicially, it is necessarily inoperative. The law must remain as it was, unless that which professes to change it be itself intelligible."
In Stoutenburgh v. Frazier, 16 App. D.C. 229, 48 L.R.A. 220 (1900), the court considered a statute in which the language was similar to that used in the statute of 34 Edward III, c. 1. Congress enacted a statute relative to suspicious persons and vagrants which read in part as follows: "That all vagrants  all idle and disorderly persons  persons of evil life or evil fame . . . shall, upon conviction thereof, be fined not to exceed forty dollars, or required to enter into security for good behavior for a period of six months." (Emphasis added) The defendant was arrested, tried and convicted on a charge of being a suspicious person. The court stated "Suspicion may exist without even the knowledge of the party who is the object of the suspicion.. . . The suspicion may be generated in the mind of one or more persons without even colorable foundation of truth for the suspicion; yet the party, the object of the suspicion, may, under the statute . . . be seized and imprisoned, tried and convicted, merely because some persons or police officer may have concluded (whether upon reasonable ground or not) that he was a suspicious person. Of what suspected? and what degree of suspicion exists? must always be the first thought that occurs upon such a charge as that made in this case. But here the party is charged, in an abstract way, with being a suspicious person merely; there being no act or conduct of his mentioned in the statute, to which the suspicion could relate. How is he to meet such a charge? . . . A suspicious character, however, does not constitute crime, nor does it justify the Government in treating the party from having such reputation as a criminal, without connecting him with some criminal act or conduct."
*179 The Court then proceeded to rule the statute to be unconstitutional, in conflict with the federal constitutional prohibitions against unreasonable searches and seizures and cruel and unusual punishments and in the course of its opinion pertinently stated: "In the legislation of England, in regard to the police of that kingdom, we find a great variety of regulations prescribed from time to time, dating back to the earlier reigns and all those in succession, down to modern times, to meet the requirements of the then existing states of society. But much of that legislation has become obsolete, and, from its severe restrictions upon the liberties of the people, and the cruel and unnatural punishments inflicted, it has long since ceased to be applicable to modern society, and could not at this day be tolerated. The history of that legislation is clearly stated by Mr. Justice STEPHEN in the third volume of his history of the Criminal Law of England, Ch. 32, pp. 263-274, and in 2 Broom & Had. Com. 467." See also People v. Alterie, 356 Ill. 307 (1934); State v. Kartz, 13 R.I. 528 (1882); State v. Beswick, 13 R.I. 211 (1881); Greene v. Briggs, Fed. Cas. No. 5,764, 1 Curt. C.C. 311; Huntsman v. State, 12 Tex. App. 619 (1882) for consideration of punishment because of reputation.
Applying then the principles of these cases to the statute of 34 Edw. III we cannot find any standard known to the law by which to measure the exercise of judicial power it purports to create. The phrase "not of good fame" is a sheer reference to general reputation; in its broadest sense it encompasses the entire expanse of conceived contemporaneous morality. It admits of any definition according to the experience and opinion of the definer. In the Lanzetta case, supra, the Supreme Court of the United States stated (at page 453): "If on its face the challenged provision is *180 repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it. Cf. United States v. Reese, 92 U.S. 214, 221; Czarra v. Board of Medical Supervisors, 25 App. D.C. 443, 453. It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression. See Stromberg v. California, 283 U.S. 359, 368; Lovell v. Griffin, 303 U.S. 444. No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or for bids." [citing, by footnote, numerous cases]
We have examined every pertinent case, modern and ancient, which we could find or to which we were referred and we are unable to conclude that the phrase "not of good fame" has in any way been made definite by judicial construction or definition and it is certainly not made definite by context or by the evil it was designed to cure: see Connally v. General Const. Co., supra, page 395. Commonwealth v. Foster, 28 Pa. Superior Ct. 400 (1905) is the only case we have found which actually considered the purport and scope of the words "not of good fame." In that case the defendant had been convicted several times "of doing worldly business on Sunday" in violation of the Act of April 22, 1794, 3 Sm. L. 177. Upon complaint by affidavit the court of quarter sessions required of him security to be of good behavior. The Superior Court reversed this order. Mr. Justice PORTER on behalf of the court, concluded that the defendant was not the type of offender contemplated by the Act of 34 Edward III, c. 1. There is language in this opinion which reflects the assumption that there exists a power to bind over after acquittal in a "proper" case, but the cases and authorities relied upon are those we have already *181 made reference to. This case has not cured the vagueness of the statute. Perhaps the most striking aspect of the judicial history of the language in the statute 34 Edw. III, c. 1, is that in 592 years it has received no definition other than in a few isolated negative instances. The illustrations used by Blackstone, Hawkins and Burn are either obviously inappropriate or so broad as to be as meaningless as the phrase to be defined. It is also obvious that many of these illustrations could only apply after a conviction.
Assuming, however, that the power to require bond for good behavior is somehow limited by the words "not of good fame" as a purported reference to our criminal law or criminal prosecutions, to just what criminal acts does it have reference? Does it refer to previous convictions? The suggestion that any person who has suffered a previous conviction is subject to being bound to his good behavior if he is again accused and acquitted is to suggest a second punishment for the same offense. Is the conclusion to be based upon evidence which we must assume the jury disbelieved? If so, evidence of what? Mr. Justice PORTER in the Foster case stated, "This record contains nothing from which it could be inferred that there was any reasonable ground to apprehend, or that this justice of the peace apprehended, that this defendant would commit any felony or misdemeanor, or disturb the peace, or in any way trouble, disturb or injure any of the people of the state, in their persons or property." Honest observation of the practice in, at least, the courts of this county would compel admission that few records reflect the matters referred to by Justice PORTER. The real function of the practice is to substitute a judicial finding of guilty for the jury's acquittal; it is punishment for past iniquity; especially is this so where the bond is fixed so high that the defendant (recently freed *182 by the verdict) is committed for default.[13] It substitutes suspicion of what a man may do for proof of violation of the criminal laws. This without a trial of the suspicion before a jury. Surely this is not due process of law.
Closely related to the problem of vagueness as an infringement on due process is the problem of the delegation of legislative power to the judiciary. It is particularly pertinent in the matter we are considering because the legislation purports to vest power in the hands of the judiciary as an aspect of their ancient role of conservators of the peace.
By Article II, section 1 of the Pennsylvania Constitution all legislative power is vested exclusively in the General Assembly. In Kellerman v. Philadelphia, 139 Pa. Superior Ct. 569, 575 (1939) the principle was enunciated that "any legislative enactment which vests in a person or body of persons free of any standard independent of his or their own mind and judgment the power of supplying, or giving force to, or suspending its terms . . ." is unconstitutional. See O'Neil v. Am. Fire Ins. Co., 166 Pa. 72 (1895); Bell Telephone Co. of Penna. v. Driscoll, 343 Pa. 109 *183 (1941); Holgate Bros. Co. v. Bashore, 331 Pa. 255, 117 A.L.R. 639 (1938); American Baseball Club of Philadelphia v. Philadelphia, 312 Pa. 311 (1933); Wilson v. Philadelphia School Dist., 328 Pa. 225, 113 A.L.R. 1401 (1937). This rule applies as well to prohibit the vesting of legislative power in the judiciary: see State v. Bates, 96 Minn. 110, 104 N.W. 709 (1905); Burnett v. Greene, 97 Fla. 1007, 122 So. 570, 69 A.L.R. 244 (1929); Opinion of Justices, 279 Mass. 607, 180 N.E. 725, 81 A.L.R. 1059 (1932); Searle v. Yensen, 118 Neb. 835, 226 N.W. 464, 69 A.L.R. 257 (1929).
Undoubtedly the principle of the separation of powers in the three departments of government applies with least force and effect to the judiciary insofar as the entire concept of judicial discretion has been evolved. But it has never been supposed that a legislature may under the guise of reliance upon discretion abdicate its power and transfer it to the judiciary. When courts are said to exercise discretion the reference is to legal discretion within not without the bounds of the law. The rule was most aptly phrased by Chief Justice MARSHALL in Osborn v. Bank of U.S., 9 Wheaton 738, 866, 6 L. Ed. 204 (1824): "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." (emphasis added). See Maloney v. Stahlnecker, 341 Pa. 517, 522 (1941); Dauphin *184 County Grand Jury Investigation Proceedings No. 3, 332 Pa. 358, 364 (1938); Schlaudecker v. Marshall, 72 Pa. 200, 206 (1872); Melnick v. Melnick, 147 Pa. Superior Ct. 564, 570 (1942).
The purport of the foregoing cases and principles must be that the legislature has no right to confer or the judiciary to accept a power in terms so broad and meaning so vague that the application or non-application of the law depends wholly upon the individual opinion and predilections of the trial judge. Any statute which makes the judge's discretion the only rule for his conduct must be regarded as invalid: see King v. State, 87 Tenn. 304, 10 S.W. 509, 3 L.R.A. 210 (1889).
What guide is there in the language of 34 Edw. III whereby the exercise of judicial discretion is to be tested? We have already set forth the aspects of vagueness in the statute whereby it fails to meet the minimum requirements of due process and we need not repeat ourselves. It is sufficient to note that nowhere is there an intelligible standard whereby a judge may consider the propriety of exercising his discretion in regard to whatever facts may appear; the words "not of good fame" receive no clarification in the early English cases prior to the formation of this Commonwealth nor in the works of ancient and respected text-writers. The words "not of good fame" do not have any settled reference to any defined act or series of acts; there need not be proved any criminal intent or purpose; there is no hearing on the issue of "good fame" nor is there any necessity to indicate the facts found or the reasons for the judge's conclusion. Indeed, what we do find in the old cases is a singular awareness of the danger in the virtually untrammeled power apparently claimed. See the quotation from Blackstone, supra, 5 Burn's Just. 746.
*185 In Commonwealth v. Davies, 1 Binney 97 (1804) there appears in a footnote the opinion of Chief Justice TILGHMAN in the case of Commonwealth v. Duane, decided on August 11, 1806. In that case, upon complaint of certain parties through the attorney general as to the publication of past libels, the Mayor of Philadelphia directed Duane to enter into a recognizance for appearance at the next Mayor's court and enter security for good behavior until his appearance at such court. Apparently he was committed upon failure to post security for good behavior. In a habeas corpus proceeding it was held that he need only post security for appearance at court and not for good behavior. Chief Justice TILGHMAN[14] discussed the matter at length and stated (pages 98-99): "Surety for good behaviour may be considered in two points of view. It is either required after conviction of some indictable offence, in which case it forms part of the judgment of the court, and is founded on a power incident to courts of record by the common law, or it is demanded by judges or justices of the peace out of court, before the trial of the person charged with an offence, in pursuance of authority derived from a statute, made in the 34th year of Edward 3. It is this last kind of surety we are now to consider. The statute 34 Edward 3. authorizes justices of the peace to take surety for good behaviour of all those that are not of good fame, to the intent that the public may not be troubled by such persons. It is supposed that this statute was made *186 to prevent the disorders which were introduced by the soldiers of Edward the third, numbers of whom, after serving in his armies in France, were discharged in England. The natural meaning of the words `persons not of good fame' seems to be, those who by their general evil course and habits of life had acquired a bad reputation, and were supposed to be dangerous to the community. In process of time, however, the construction of these expressions has been extended far beyond their original meaning, and persons are now commonly held to find surety for their good behaviour, who are not generally of ill fame, but have only been charged with some particular offence. It is laid down by some ancient authors, that libellers may be held to surety for good behaviour. . . ."
There then followed a discussion of surety for good behavior to prevent libel and of the contention that it was a thing "of course." The Chief Justice continued (page 101): ". . . Now if this practice is established, two consequences will follow, which certainly may be attended with great inconvenience. In the first place the justice who takes the recognisance may fix it in whatever sum he pleases, and then if it should be forfeited by a libel of the mildest nature, the whole penalty must be recovered, without any power in the court to mitigate the punishment according to the nature of the offence. And in the second place, the defendant may be brought to trial for a libel, so far as to be burthened with the forfeiture of his recognizance, without the previous investigation of a grand jury. No considerate man will say that under certain circumstances these may not be very great evils. No man can exactly calculate how far a practice of this kind, exercised by wicked and daring hands, into which it may sometimes fall, may stifle or even extinguish the spirit of honest investigation and necessary inquiry. And *187 what is the occasion for it? The party complaining has a right to the protection of the laws and will receive it. The person accused will be brought to his trial, and if convicted he will be punished according to the degree of the offence. What more does public justice require? But it is said, it is necessary to prevent future libels. If future libels are published while the prosecution is depending, they will be punished on conviction in proportion to the obstinacy of the offender. No man abhors more than I do the base practice of libelling. It is a crime forbidden by the laws of God and man, and of a much blacker dye than many men seem to be aware of. All classes and descriptions of men, all parties have in their turn lamented and suffered by the uncontrolled licentiousness of the press. I am not without hopes that the evil will be lessened, that a remedy will be found in the honesty and good sense of a majority of the people, aided by the wholesome chastisement which courts and juries will be called on from time to time to inflict. But in order to give those punishments their full efficacy in the community, it will be necessary in judicial proceedings to temper firmness with liberality, never forgetting that humane principle, which in doubtful cases turns the scale in favour of the accused.
". . . In the present case, Duane is charged with publishing two libels against the same person, and he has not confessed that he is the author of either. As a judge, I know nothing that is not legally proved before me. I must not act on the supposition that the defendant has published numerous libels, because there is no oath to that purpose, and by our constitution all warrants must be grounded upon an oath or affirmation. Upon the whole, the most that can be said with regard to recognisances for good behaviour is, that they are demandable or not, at the discretion of the judge. They *188 differ from recognisances to keep the peace, in two important features: 1. Surety for good behaviour is more extensive in its nature than surety for the peace, and may be more easily forfeited, and therefore should be exacted with greater caution. 2. Surety of the peace is demandable of right by any individual who thinks himself in danger of bodily hurt, and will make the necessary oaths; but this principle has not been applied to surety for good behaviour. I will not say that there are no circumstances in which surety for good behaviour ought not to be exacted in cases of libels before conviction; on the contrary, I have no doubt but there are occasions on which it may be proper and necessary to insist on it. But I am of opinion that it will be most agreeable to the spirit of our constitution, and most conducive to the suppression of libels, to adopt it as a general rule, not to demand surety for good behaviour before conviction."
In Commonwealth v. Keeper of the Prison, 1 Ashmead's Rep. 140 (1828?), a habeas corpus proceeding, the relators had been "required to give bail for future good conduct and behavior towards `a named individual' as well as to all the good citizens of the commonwealth"; upon refusal to enter bail they were committed until the "next Mayor's Court." The court in its opinion discussed the facts at length indicating that there was an issue as to whether defendants had committed a forcible entry. The question was as to the propriety of obtaining surety of the peace against future repetition; the relator had never been tried. President Judge KING stated (p. 148) that guilt should be "`as clear as the sun in the firmament'" to "authorize a judge to usurp the functions of a court and jury, and to decide, first, that a crime accompanied with a breach of the peace has been committed, and that the party charged should be coerced under pain of imprisonment *189 to give surety against its future repetition. . . . The relators before I should demand surety of the peace from them on the assumption that they are forcible enterers and rioters, have the legal and constitutional right of having that vital question determined by a jury of their peers. The argument that a demand of surety of the peace is a more mild and merciful proceeding than a prosecution by indictment, is more specious than solid. In effect it gives to a single magistrate, a power which pertains only to a court and jury, and in substance deprives the accused of what is his most inestimable right, the trial by jury. I would ask the advocates of this doctrine what is to limit the magistrate or subsequently the court to which suretyships are returnable, either as to the length of time for which they shall be continued, or the amount of bail by which they shall be rendered effectual. Moderate bail and the party's recognizance is only demanded in this instance by a mild and humane magistrate, but under less auspicious circumstances a different requisition might be made, and the citizen deprived of his liberty without `the judgment of his peers,' or as I believe `the law of the land.' This doctrine is not novel. `Surety of the peace,' says Dalton, page 266, `ought not to be granted on account of a past beating, unless there be fear of future danger: the remedy in such case being by action or indictment.' How much stronger is this case where the evidence renders it doubtful whether a public offence, a private injury, or any wrong has been done, from that put by this ancient author, where the act is necessarily criminal, and the threat to repeat it, a threat to commit a certain crime.
"The Mayor's Court of the city is now in session and the grand jury not discharged. If it is desired to have a judicial decision on the character of this entry, let a bill of indictment be submitted to that body. By *190 certiorari such a bill would be removed to the Supreme Court, and the judgment of that dignified tribunal between these parties ascertained. If Jeremiah Willetts feels himself personally aggrieved by Edmund Shotwell, the courts of the Commonwealth are open to him. But until the guilt of these defendants of the crimes imputed to them is duly substantiated, I cannot under the circumstances of this case, demand of them a surety which can never be justly called for on the mere assumption of their guilt. On the whole I am compelled to differ from what I have no doubt was the sincere and conscientious judgment of the Mayor, and accordingly refuse to call on the relators to give surety to keep the peace. No other requisition being made of me, they are discharged and at liberty to go where they please."
Not only do we find that there is no limitation set forth as to when the trial judge shall exercise his "discretion" requiring bond for good behavior, but as pointed out in the three preceding cases there is no limitation as to the period of time during which bond shall be required or as to the amount of the bond to be required. The prohibition against unrestrained power to define the substance of penal conditions is also a prohibition against unrestrained power to determine the sanctions which are to be applied. In South Bethlehem v. Hackett, 4 North. Co. 381, 12 Lanc. L.R. 196 (1895) it was held that a statute which made failure to pay a certain license tax a crime punishable by a fine of not less than $100. was invalid as an improper delegation of legislative power because it did not fix a limit to the amount of the fines which could be imposed.[15]
*191 From our consideration of this matter we are of the opinion that the only possible basis for conceding contemporary validity to this 1360 statute is its age and the age of certain ill-considered text comments, a variation of the supposition that "whatever is is right." We choose, however, to conclude that civil rights are not lost by historical default; that error compounded by error remains nonetheless error. Age alone certainly does not render a statute invalid; nor does the fact that it was adopted in and for different times and purposes. Conversely, however, age alone cannot insulate a statute from attack when in different time and social context and in different constitutional milieu it is in irreconciable conflict with concepts of individual rights and criminal law.
Counsel for the petitioner in his excellent brief has indicated at length the vast and significant differences in the world of 1360 and the world of 1952. We shall not undertake any extended historical review of those differences. Suffice it to note that that statute fell into a period of disorganization, riot, illness and death. In Commonwealth v. Duane, supra, Chief Justice TILGHMAN correctly observed that the reason for the statute was that, due to temporary peace, the soldiers of Edward III returned from years of plundering and pillaging in France, which practice they apparently *192 continued in England. The condition of Europe and England is set forth in Volume IV (Vol. 1 of the series, The State of Europe during the Middle Ages) of the monumental work of Henry Hallam (10th ed., Little Brown & Company, Boston 1853) in chapter I, part II. For one hundred and twenty years war between France and England raged in greater magnitude than any since the fall of the Roman Empire, interrupted once by a truce in 1357 by the Peace of Bretigni. During the same period pestilence laid waste the peoples of Europe and England and Hallam indicates what must have "returned home" to England in a passage as follows (pages 56-57): "There is no affliction which did not fall upon France during this miserable period. A foreign enemy was in the heart of the kingdom, the king was a prisoner, the capital in sedition, . . . Famine, the sure and terrible companion of war, for several years desolated the country. In 1348, a pestilence, the most extensive and unsparing of which we have any memorial, visited France as well as the rest of Europe, and consummated the work of hunger and the sword. The companies of adventure, mercenary troops in the service of John or Edward, finding no immediate occupation after the truce of 1357, scattered themselves over the country, in search of pillage. No force existed sufficiently powerful to check these robbers in their career." See L. Owen Pike, 1 History of Crime in England, chapter 4 (1873); Bertha H. Putnam, the Ames Foundation, Proceedings Before the Justices of the Peace, Edward 3rd to Richard 3rd, page 33 (1938); Sir James F. Stephen, A History of the Criminal Law of England, London (1883); 2 Gabbett, Criminal Law 121 (1843).
In final analysis the power which the judiciary has arrogated unto itself is a crystalization of a judicial attitude that the jury is not to be fully and finally *193 trusted with its function. The power to bind to good behavior after acquittal is and has been used when the trial judge is of the opinion that the jury erred in its verdict. Without discussing the nature, history and function of the jury, in an already over-extended opinion, it should be sufficient to observe that the jury is more than just a juridical instrument, it is a political institution which should not be hastily infringed upon in particular and difficult cases lest the generality of freedom which it purports to represent be undermined without planned substitute. To the jury belongs the power to err, not alone in gullibility but also deliberately. A most important portion of the administration of our system of criminal justice is the fact that the jury in subtle ways may temper the rigidity of our criminal code in the application of the letter of the law to particular cases and may perhaps thereby mitigate the rigors of the law.[16]
Finally we may state of record that the essentially real basis for our decision is simply that we consider the practice under review to be wrong. We are of the firm conviction that the practice is fundamentally in conflict with any modern and enlightened view of individual civil rights; that it offends the spirit and instinct, and the very letter of due process. The practice of binding after acquittal, even if we were to assume a proper historical basis for it, which we do not, is an anachronism; it is a vestige of a social form which has passed and it cannot coexist with the modern concept of due process; it has been repealed by change. Our very jurisprudence is predicated upon rule by *194 law as distinguished from rule by man. The evil of the practice we are considering is that it is in reality an effective power to punish in virtually unrestrained form. Suppositions of right to review are in practice unrealistic. The liberties of the people are not to be committed to such despotic power  be it executive, legislative or judicial; nor are these liberties to be diluted by pretense and supposition that such virtually unreviewable power will be wielded sparingly.
Regardless of the state of the law prior to the 14th amendment we hold that the modern concept of due process has, in any event, rendered obsolete the practice of requiring security after acquittal. That change and growth are implicit in the concept of due process was indicated by Mr. Justice FRANKFURTER in Wolf v. Colorado, 338 U.S. 25, 27 (1948): "Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society. But basic rights do not become petrified as of any one time, even though, as a matter of human experience, some may not too rhetorically be called eternal verities. It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights.
"To rely on a tidy formula for the easy determination of what is a fundamental right for purposes of legal enforcement may satisfy a longing for certainty but ignores the movements of a free society. It belittles the scale of the conception of due process. The real clue to the problem confronting the judiciary in the application of the Due Process Clause is not to ask *195 where the line is once and for all to be drawn but to recognize that it is for the Court to draw it by the gradual and empiric process of `inclusion and exclusion.' Davidson v. New Orleans, 96 U.S. 97, 104. This was the Court's insight when first called upon to consider the problem; to this insight the Court has on the whole been faithful as case after case has come before it since Davidson v. New Orleans was decided."
The practice we have reviewed is in reality not in any real sense a method of "preventive justice." When a person is committed for default of entry of security after acquittal he is simply being punished without trial. If this power so clearly derives from the common law, why does it not exist in a single one of our sister states?
Rule to show cause why recognizance should not be quashed, and discharge made absolute.
*196 PER CURIAM, November 12, 1952:
The majority of the members of the Court, Judge DITHRICH dissenting, agree that the order of the court below should be affirmed on the opinion of Judge MILNER.
Order is affirmed.
NOTES
[1] See the excellent note in 88 U. of Pa. L. Rev. 331 (1940) for a careful review of the practice of requiring bonds in the United States and note the careful distinction maintained throughout between surety to keep the peace and demand of a bond for good behavior; the distinction is also maintained for bonds demanded after conviction and those demanded after acquittal.
[2] In United States ex rel. Henson v. Mills, 21 F. Supp. 616 (E.D. Pa., 1937), reported also in 31 D. & C. 47, a habeas corpus proceeding, Judge MARIS reviewed an order, after acquittal, directing entry of bail in the sum of $25,000. to keep the peace and be of good behavior for a period of ten years. The question of due process was not thoroughly considered and was not argued. There was dicta (based on an assumption of propriety) which we may ignore. See also the dicta in Commonwealth v. Andrews, 211 Pa. 110, 112-13 (1905).
[3] This reference to Sergeant Hawkins we shall consider infra. The reference to "Comb. 40" is to Rex v. Sir John Knight and is also discussed infra.
[4] See Commonwealth v. Duane (1806) reported in full in footnote (a) in Commonwealth v. Daries, 1 Binney 97 (1804); and also see Commonwealth v. Keeper of the Prison, 1 Ashmead 140 (1828?) discussed infra. More recently see Commonwealth v. McClain, 84 Pitts. L.J. 171 (1936).
[5] This phrase from Magna Charta signifies that "No free man shall be taken, or imprisoned, . . . except by legal judgment of his peers or the law of the land."
[6] Pursuant to Act of April 7, 1807, P.L. 163.
[7] We shall not here consider the interesting contention that this statute was incorrectly translated from the Norman French: See 27 Eng. Hist. Rev. 227 and see Lansbury v. Riley, (1914) 3 K.B. 229, 231.
[8] In 2 Hale's Pleas to the Crown 136-7 (Sun. Ed. 1847) the subject matter is discussed but no additional judicial authority is referred to.
[9] Hawkins actually cites Cro. Jac. 507 but the cases there reported are obviously inappropriate and the reference must be as we have stated to the Evans case, which is cited by Hawkins in a footnote comment.
[10] By familiar law this case being by an evenly divided court is not to be considered as binding precedent but adjudicates only the right of the parties in that particular case: Commonwealth ex rel. Vesneski v. Reid, 265 Pa. 328, 335 (1919); Griel's Estate, 171 Pa. 412, 416-17 (1895); Commonwealth v. Heller, 147 Pa. Superior Ct. 68, 78 (1942); Etting v. Bank of United States, 11 Wheaton 59, 78.
[11] See also The King v. Burford, 1 Ventris, 16, 86 Eng. Rep. 12 (21 Car. II, 1670) where defendant was indicted for scandalously stating that the justices did not understand the excise laws. It was held that the indictment should be quashed; that a man could not be indicted for speaking such words. The court then added that "he might have been bound to his good behavior." In Collin's v. Man, 1 Lev. 107, 83 Eng. Rep. 321 (15 Car. II, 1664) surety of peace ("bound to his good behavior") was required of defendant for using ill language in Westminster Hall.
[12] We need not concern ourselves with the course by which judges of the courts of common pleas have acquired the powers granted to justices of the peace.
[13] In the Pennsylvania Report of Legislative Commission to Investigate Administration of Criminal Justice (July, 1938), it was stated, "A practice has grown up among certain judges in Philadelphia in holding in `Bonds to Keep the Peace' defendants who have been acquitted by juries, and in some cases, persons who have not been charged with any criminal offense. The bonds are often fixed at an exorbitant sum which such persons cannot procure and the effect is to keep men in prison for long periods of time until the judge decides to release them." The commission also stated, ". . . it is the conclusion of many eminent jurists, lawyers, and scholars, that such procedure is clearly unconstitutional and a flagrant and dangerous abuse of judicial power." It is clear, however, that the Commission did not rely upon any judicial authorities for its assertion and we are now to determine whether that expressed opinion was correct.
[14] When it is considered that Justice TILGHMAN was Chief Justice of the Supreme Court when the Report of the Judges was made as to English Statutes in force in this commonwealth his expressed view that surety for good behavior could be demanded either after conviction as part of the judgment of the court or "before the trial" of a "person charged with an offense" is entitled to careful consideration in determining the extent of the authority conferred by 34 Edward III., c. 1.
[15] Compare the Act of May 27, 1919, P.L. 306, empowering Justices of the Peace, in the exercise of discretion, to impose costs on the defendant, despite acquittal. In Commonwealth ex rel. Heydt v. Bossler, 29 Pa. Dist. R. 171 (1919) this practice was ruled invalid. See also Commonwealth v. Webster, 23 Luz. L.R. 359 (1924); Commonwealth v. Cooper, 21 Luz. L.R. 264 (1921); Commonwealth v. Emerick, 6 D. & C. 434 (1924); Commonwealth v. Reynolds, 26 Lack. 133 (1925); contra, Commonwealth v. Brown, 1 D. & C. 609 (1922). In the Webster case, supra, President Judge FULLER stated, "We feel impelled to add that this whole matter of costs, under our system of criminal jurisprudence, is an instrument of oppressive cruelty which belongs to the Dark Ages, and should not be tolerated in an age which claims to be civilized."
[16] Consider, for example, the manner in which eighteenth century juries informally amended the broad scope of the law's definition of capital offenses by simply refusing to return guilty verdicts in cases in which such penalty offended the conscience of the people. Also, recall the early trials of Peter Zenger and William Penn.