## Archbishop O'Hara's Appeal.

36

38

Argued January 14, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*James E. Gallagher, Jr.*, with him *William F. Fox, Fox, Differ & Honeyman* and *Stradley, Ronon, Stevens & Young*, for appellant.

*Samuel L. Sagendorph*, for intervenors-appellees.

*Samuel H. High, Jr.*, for Cheltenham Township, intervenor-appellee.

Opinion by Mr. Justice Benjamin R. Jones, April 26, 1957:

The language of former Chief Justice Stern in *Devereux Foundation, Inc., Zoning Case*, 351 Pa. 478, 479, 41 A. 2d 744, is particularly applicable to this appeal: "We are here called upon to deal with a type of controversy in which two interests, each in itself

legitimate and wholly commendable, come into conflict merely by reason of the proximity of their locations. The one interest is that of a school . . ., and the other that of the inhabitants of a fine residential suburban section who oppose . . . erection of the school."

The following facts as they appear in the opinion of the learned court below are pertinent and relevant to this appeal:

1.

"His Excellency, Most Reverend John F. O'Hara, C. S. C., Archbishop of Philadelphia, . . ., is the equitable owner of approximately eighteen acres of vacant land located in Wyncote, Cheltenham Township, Montgomery County, Pennsylvania, having a frontage on Royal Avenue of 750.2 feet and bounded on the East and North by residences and on the West by the right-of-way of the Philadelphia and Willow Grove Street Railway Company . . . .

2.

"Said property is situate in an 'AA' residential district as defined by the Cheltenham Zoning Ordinance of 1929 as amended.

3.

"Said Zoning Ordinance as to 'AA' Residence Districts, Article III, provides, inter alia, as follows: 'Section 301.—A building may be erected, altered, or used and a lot or premises may be used for any of the following purposes and for no other: (3) *Educational*, religious, or philanthropic *use by and with the consent of the Board of Adjustment,* excluding hospitals, sanitarium, rest home or correctional institution and including dormitory of an educational institution.' (Italics added).

4.

"On June 25, 1954, petitioner filed his application requesting a special exception so that said premises

might be used for educational purposes, a regional diocesan high school to serve fourteen parishes.

5.

"At the public hearing held on August 24, 1954, the plans provided for the erection of a regional, diocesan high school, three stories high, 337 feet in length by 65 feet in width with two extensions in the rear, one for a gymnasium and the other for an auditorium to accommodate 1,000 to 1,200 Catholic boys and girls, not to exceed 2,000 students. In addition, it was planned to construct a faculty house to accommodate 40 priests; three small convents for 20 sisters each, a parking area to accommodate 436 automobiles and in the rear a stadium for athletic events with portable seating to accommodate 3,200 persons.

6.

"On December 1, 1954, the Board of Adjustment, in a twelve page report, denied the application for a special exception . . . .

7.

"Three hearings were held (before the court below) and petitioner had made various changes in his plans and proposals, concerning the size of the high school building and faculty accommodations, and has entirely eliminated the stadium. (Words in parentheses added)

8.

"The present plan before the court provides for the erection of a diocesan high school covering four years of high school education, which will serve fourteen parishes. . . . There will be no students attending the proposed high school from the City of Philadelphia.

9.

"The present proposed high school is to be built to accommodate 1,200 pupils and will not be expanded to accommodate more than 1,600 pupils.

**10.**

"There are presently a total of 1,035 Catholic children of high school age in the fourteen parishes that would be served by the proposed diocesan high school. . . .

**11.**

"The tract of land upon which the proposed high school is to be erected contains approximately eighteen acres with a frontage of approximately 750 feet on Royal Avenue, a public street in Cheltenham Township, having a 40 foot right-of-way with 24 feet paved between curbs, but no sidewalks. Said tract is approximately 600 feet from Easton Road and approximately 1,000 feet distant from Rice's Mill Road and the westerly line of the property abuts a right-of-way of the Philadelphia Transportation Company, which operates a street railway from Philadelphia to Willow Grove.

**12.**

"The proposed high school building will be 242 feet in length, fronting on Royal Avenue, and 65 feet in depth. It is the top cross member of a letter 'T', the stem of the 'T' being 120 feet deep and 98 feet wide. The building itself will set back 90 feet from the center line of Royal Avenue or 70 feet from the ordained road width.

**13.**

"The school building will be of modern, fire-proof brick construction and design, containing three floors and a basement, . . . .

**14.**

"Said proposed building is to contain 24 classrooms, a gymnasium or auditorium . . . .

**15.**

"With permission of the municipal authorities, petitioner plans to widen Royal Avenue, so that in front

of the school for a total distance of 440 feet Royal Avenue would be widened to an extra width of 20 feet, and for the balance of the frontage on Royal Avenue, a widening of 8 feet.

### 16.

"In addition to the widening of Royal Avenue, petitioner proposes to install a paved secondary 20 foot wide highway parallel to Royal Avenue and about 30 feet to the north of Royal Avenue; also 20 feet wide entrance and exit roads leading to a parking area to the rear of the school.

### 17.

"The proposed parking area is to be located 285 feet from Royal Avenue and would safely park 164 cars. In addition, there would be single parking capacity, or easy single car passage for 60 more cars, making a total of off-highway parking for 224 cars. This would furnish more off-street parking facilities than required by the township ordinance.

### 18.

"Concrete sidewalks are planned along the Royal Avenue frontage and access sidewalks entirely around the school as well as access sidewalks to all secondary buildings.

### 19.

"The plans also provide for the erection of three residence buildings on the tract, two being convents accommodating 20 persons, and a male faculty residence accommodating approximately 15 persons.

### 20.

"The buildings will occupy 5% of the total area of the land, and 6.2% when all planned buildings are completed. Approximately one-third of the total area will be used for school, living, and parking purposes, and two-thirds of the area in the rear will be unde-

veloped but used for recreational purposes, but not for a stadium.

### 21.

"This 18 acre tract is located in Wyncote in the middle of an 'AA' residential district, which district has been almost completely developed by the construction of from 325 to 350 fine, single family dwellings ranging in value from $20,000 to $40,000 each.

### 22.

"The residential district in which petitioner's property is located was developed entirely for country or suburban residential living and all of the township streets in this vicinity which lead to petitioner's land are narrow streets intended to accommodate limited traffic for residential purposes. This neighborhood has no sidewalks or municipal street lighting.

### 23.

"Royal Avenue, being the only street on which petitioner's property fronts, affords the only entrance and exit to the property. It is 2300 feet in length. Its western terminus is at Easton Road and its eastern terminus is at Rice's Mill Road. The width of the cartway is 24 feet. The access roads from Church Road, such as Mulford Road, Gribbel Road, Sinkler Road, Rice's Mill Road, and Bickley Road are blacktop roads with a paved cartway of 24 feet, with the exception of Mulford Road which is like a winding country lane. All of these roads are only wide enough for ordinary residential traffic. Some of the intersections of these roads with Royal Avenue are dangerous intersections for vehicles and pedestrians.

### 24.

"Royal Avenue can be entered from Easton Road, Rice's Mill Road, and the above access streets from Church Road. It is estimated that 720 students would

come to this school by public transportation, either Reading Company bus lines or Philadelphia Transportation Company street railway; 240 would walk to school, and 240 would come by private car. No school buses would be operated by the school or the archdiocese.

25.

"The use of this tract for a regional diocesan high school, . . ., will increase traffic . . . .

26.

"To remedy this condition, the township would be required to spend thousands of dollars on the widening of the nearby streets, provide safe sidewalks for the public, especially these pupils, and install proper street lighting and traffic controls.

27.

"This requested use of the land will change the quiet residential character of the neighborhood and will have a slight damaging effect on real estate values and the entire neighborhood.

28.

"Adjacent to this tract on Royal Avenue there is an 8 inch sanitary sewer which is adequate to carry the burden that would be placed upon it by the school and other buildings, but there is a possibility that a pump might have to be installed.

29.

"There are no storm sewers available in the area and with the construction of the school, accessory buildings, sidewalks and parking area, the run-off of surface water from the tract will be increased and it might be necessary to install some kind of storm water sewers, especially to the East of this tract where, at the present time, a surface water drainage problem is in litigation.

30.

"There is a borderline of trees surrounding this tract which would serve as a natural screen in most places for the protection of the adjoining home-owners.

31.

"If the property in question were developed as a residential area, the problem of storm and sanitary sewers would have to be solved by the developer before his subdivision plans would be approved.

32.

"The size of this proposed high school tract of 18 acres to accommodate 1,200 to 1,600 students does not meet the requirements of the Department of Public Instruction of the Commonwealth of Pennsylvania for a public high school, which recommends that sites for high schools or secondary schools shall have a minimum area of 10 acres and 1 additional acre for every 100 students of ultimate enrollment over a 6 year period. Under this recommendation the tract should contain 26 acres at least.

33.

"Parochial schools are not bound by this requirement or recommendation . . . ."

After refusal by the Board of Adjustment of appellant's application for a "special exception" to build this school, the court below held a hearing de novo after which it denied the application and affirmed the Board's decision. Exceptions having been taken to this decision, the court en banc reaffirmed the order of the hearing judge and from that final order this appeal was taken.

The hearing judge denied the application for the following reasons: (1) that the proposed use of the site would "adversely affect the safety of the public by creating traffic congestion, dangers and hazards"; (2) that the proposed use would "destroy the residen-

tial character of the neighborhood"; (3) that the widening of streets, the placement of sidewalks and street lighting necessitated by the proposed use would be expensive for the taxpayers; (4) that the value of nearby residences would be depreciated; (5) that the size of the tract is inadequate under the recommendation of the Department of Public Instruction, and (6) that another site owned by appellant is better suited for the purpose.

When the matter came before the court en banc appellant raised three questions not previously argued: (1) that both the Board and the Court erred in treating appellant's application as a request for a "special exception"; (2) that the zoning ordinance was not within the scope of the enabling statute applicable to first class townships, and (3) that §301(3) of the zoning ordinance was unconstitutional in that it constituted an unlawful delegation of legislative authority to the Board of Adjustment.[1]

The court en banc not only affirmed the hearing judge's order and approved the reasons assigned therefor but also found the ordinance constitutional.

In limine, we consider whether this section of the ordinance was constitutional. Appellee urges, however, that this question cannot be now considered because appellant did not raise the question in the court below. It is well settled that, as to appellants, "Matters not raised in, or considered by, the court below cannot be invoked on appeal even though they involve constitutional questions": *Montgomery C. Bar Assn.*

---

[1] That appellant followed the procedure provided in the ordinance did not preclude him from questioning its validity: *Taylor v. Moore*, 303 Pa. 469, 472, 473, 154 A. 799; *Medinger Appeal*, 377 Pa. 217, 220, 104 A. 2d 118; *Garbev Zoning Case*, 385 Pa. 328, 122 A. 2d 682. See also, *Baronoff v. Zoning Board of Adjustment*, 385 Pa. 110, 122 A. 2d 65.

*v. Rinalducci,* 329 Pa. 296, 298, 197 A. 924; *Fisher v. Brick,* 358 Pa. 260, 56 A. 2d 213; *Mullooly v. Short,* 365 Pa. 141, 74 A. 2d 136; *Weaverland Independent School District Case,* 378 Pa. 449, 106 A. 2d 812. Cf: as to appellees, *Sherwood v. Elgart,* 383 Pa. 110, 115, 117 A. 2d 899; *Commonwealth v. Pittman,* 179 Pa. Superior Ct. 645, 647, 118 A. 2d 214. That rule, however, is inapplicable in the present situation because the question of constitutionality was raised—albeit tardily—in the lower court, that court sitting en banc fully considered the question and, therefore, the evil sought to be avoided by the rule is non-existent.

A fundamental principle of our constitutional law is that the power conferred upon a legislature to make laws cannot be delegated by that branch of government to any other body or authority: Cooley's Constitutional Limitations, p. 224 (8th. ed.); *United States v. Shreveport Grain & Elevator Co.,* 287 U. S. 77, 53 S. Ct. 42;[2] *Baldwin Township Annexation Case,* 305 Pa. 490, 158 A. 272; *American Baseball Club v. Phila.,* 312 Pa. 311, 167 A. 891; *Holgate Bros. Co. v. Bashore,* 331 Pa. 255, 200 A. 672; *Bell Telephone Co. of Penna. v. Driscoll,* 343 Pa. 109, 21 A. 2d 912; *Kellerman v. Philadelphia,* 139 Pa. Superior Ct. 569, 13 A. 2d 84. While the legislature cannot delegate the power to make a law, it may, where necessary, confer authority and discretion in an administrative tribunal in connection with the execution of the law: *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 342, 343, 54 A. 277. However, such authority and discretion may not be conferred by

---

[2] *Holgate Bros. Co. v. Bashore,* infra, pp. 259, 260: ". . . the type of delegation of power by a legislative body which is invalid under the one Constitution is also invalid under the other, and that reliance may be placed upon such decisions arising under the Constitution of the United States in construing the Constitution of Pennsylvania."

the legislature except under the limitations of a prescribed standard or standards under which the authority and discretion are to be exercised: *U. S. v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 282 U. S. 311, 51 S. Ct. 159; *Panama Refining Co. v. Ryan*, 293 U. S. 388, 55 S. Ct. 241; *Taylor v. Moore*, supra; *Holgate Bros. v. Bashore*, supra; *Devereux Foundation, Inc. Zoning Case*, supra; *Root v. Erie Zoning Board*, 180 Pa. Superior Ct. 38, 42, 118 A. 2d 297.[3]

McQuillin, Municipal Corporations (3rd Ed.), Vol. 8, Sec. 25.62, p. 137 states: "The fundamental rule that an ordinance must establish a standard to operate uniformly and govern its administration and enforcement in all cases, and that an ordinance is invalid where it leaves its interpretation, administration or enforcement to the unbridled or ungoverned discretion, caprice or arbitrary action of the municipal legislative body or of administrative bodies or officials, is fully applicable to zoning ordinances. In other words, zoning ordinances and regulations should establish uniform rules to guide administrative officers in applying them. The rule merges with that of definiteness and certainty; zoning restrictions must be clear as a rule of law and not left to proof."

Does the grant of or refusal to consent by the Board of Adjustment under §301(3) of the zoning ordinance

---

[3] The following standards have been held adequate: "just and reasonable" (*Tagg Bros. & Moorehead v. United States*, 280 U. S. 420, 50 S. Ct. 220) ; "public interest" (*New York Central Securities Corp. v. U. S.*, 287 U. S. 12, 53 S. Ct. 45) ; "public convenience", "interest" or "necessity" (*Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co.*, 289 U. S. 266, 53 S. Ct. 627). See also: *Breinig v. Allegheny County*, 332 Pa. 474, 2 A. 2d 842; *Annenberg v. Roberts et al.*, 333 Pa. 203, 2 A. 2d 612; *Bell Telephone Co. of Penna. v. Driscoll*, supra; *Marshall Impeachment Case*, 363 Pa. 326, 69 A. 2d 619; *Kellerman v. City of Philadelphia*, supra; *Commonwealth v. Franklin*, 172 Pa. Superior Ct. 152, 92 A. 2d 272.

depend upon a standard or standards provided either in that section or in some other section of the ordinance? An examination of §301(3) does not reveal the existence of any standard upon which the consent can be granted or withheld. Appellee urges that the standards are to be found in language of the enabling act[4] and in §1201 of the zoning ordinance. Section 1201—the enabling statute contains identical language —provides that the board should have the power "to hear and decide special exceptions to the terms of this Ordinance in such cases as are herein expressly provided for, in harmony with the general purpose and intent of this Ordinance, with power to impose appropriate conditions and safe-guards." In *Devereux Foundation, Inc. Zoning Case,* supra, p. 483, the court, construing identical language contained in the enabling act applicable to second class townships, and in a zoning ordinance passed pursuant thereto, stated: "As far as the terms of the Easttown Township ordinance appear in the record there are no rules therein contained in accordance with which special exceptions may be made." In *Dooling's Windy Hill, Inc. v. Springfield Township,* 371 Pa. 290, 294, 89 A. 2d 505, quoting with approval the *Devereux* case, we held that the zoning ordinance therein involved revealed no "appropriate conditions and safeguards" to control the granting or withholding of a special exception. Appellee urges that *Borden Appeal,* 369 Pa. 517, 87 A. 2d 465, in substance upheld the constitutionality of this ordinance. An examination of *Borden Appeal* indicates that the question of the constitutionality of the ordinance was not raised; therefore, *Borden Appeal* is not authority in support of the constitutionality of this ordinance.

---

4 Act of 1931, June 24, P. L. 1206, as amended 1949, May 27, P L. 1955, §59, 53 PS §§19092-3107.

Cf: *Congregation Adath Jeshurun v. Cheltenham Township,* 70 Montg. Co. L. R. 345, 352, in which the Court of Common Pleas of Montgomery County considered the constitutionality of this same ordinance.

Sections 301(3) and 1201(b) standing alone would indicate that the board is granted an unlimited and unfettered and, therefore, invalid discretion. However, section 1413 of this ordinance provides, inter alia: "In interpreting and applying the provisions of this Ordinance they shall be held to be the minimum requirements for the promotion of the health, safety, morals and general welfare of the Township." It is this section which provides sufficient appropriate conditions and safeguards controlling the board's discretion to render valid the ordinance: *Medinger Appeal,* 377 Pa. 217, 221, 104 A. 2d 118 and cases therein cited. Within the terms of this section appear basic standards and a definite policy and rule of action sufficient for the guidance of the board in the exercise of its discretion: *Katzin v. McShain,* 371 Pa. 251, 89 A. 2d 519. A reading of the ordinance in its entirety is convincing of its validity.[5]

In view of the silence of the statute on the subject of appeal from the order of the lower court the scope of our review is certiorari in the broadest sense and we review the record "only to see whether there is evidence to sustain the court's findings and whether the proceeding is free from a violation of law and any manifest abuse of discretion": *Food Corporation v.*

---

[5] There is a presumption as to the validity of this ordinance: *Whitpain Township v. Bodine,* 372 Pa. 509, 511, 94 A. 2d 737; *Boyle Appeal,* 179 Pa. Superior Ct. 318, 323, 116 A. 2d 860. In construing this ordinance we adopt that interpretation which will prevent any conflict with the Constitution: *Fidelity-Philadelphia Trust Co. v. Hines,* 337 Pa. 48, 10 A. 2d 553; *Hotel Casey Co. v. Ross,* 343 Pa. 573, 23 A. 2d 737.

*Zoning Board of Adjustment,* 384 Pa. 288, 293, 121 A. 2d 94; *Kaufman Const. Co. v. Holcomb,* 357 Pa. 514, 55 A. 2d 534. In *Rolling Green Golf Club Case,* 374 Pa. 450, 458, 97 A. 2d 523, we said: "On appeal from a decision of a Court of Common Pleas in a zoning matter the case comes before an appellate Court as on certiorari, and where there is adequate evidence to support the findings of the Court below and the proceeding is free from error of law and there has been no manifest abuse of discretion, the decision will not be reversed." Cf: *Dooling's Windy Hill, Inc. v. Springfield Twp.,* supra; *Lindquist Appeal,* 364 Pa. 561, 73 A. 2d 378; *Gratton v. Conte et al.,* 364 Pa. 578, 583, 73 A. 2d 381; *Borden Appeal,* supra, pp. 519, 520; *Katzin v. McShain,* supra; *Kovacs v. Ross Township Board of Adjustment,* 173 Pa. Superior Ct. 66, 95 A. 2d 350; *Schaub Appeal,* 180 Pa. Superior Ct. 105, 110, 118 A. 2d 292. Since the learned court below took additional testimony, the test will be not whether the board but whether the court erred in any of these respects: *Appeal of Volpe,* 384 Pa. 374, 121 A. 2d 97.

Before the board and the hearing judge the appellant sought a "special exception", that is "An 'exception' in a zoning ordinance . . . allowable where facts and conditions detailed in the ordinance, as those upon which an exception may be permitted, are found to exist": *Devereux Foundation, Inc. Zoning Case,* supra, p. 483; *Lukens v. Ridley Twp. Zoning Board,* 367 Pa. 608, 612, 80 A. 2d 765; *Root v. Erie Zoning Board of Appeals,* supra, p. 41. Before the court en banc the appellant then changed his position, contending that what he requested was neither a "special exception" nor a "variance", but an undesignated third category wherein the board would determine simply whether the contemplated use was "educational". The board's authority to act arises exclusively from the ordinance

and the enabling statute; the language of both demarcates its jurisdiction. Under the language of the ordinance and the statute the board's jurisdiction is limited to three classes: appeals, requests for a "special exception" and requests for a "variance".[6] Unless appellant's request falls within one of these classes the board lacks jurisdiction to act. Since appellant's application is neither an "appeal" nor a request for a "variance", we must consider it as a request for a "special exception" or not at all. Further if appellant's present, as distinguished from his initial, position is correct, the requirement in both the ordinance and statute that the board "hear" the application is futile. In *Katzin v. McShain*, supra, p. 253, it was said: "the power to conduct a hearing necessarily includes the authority to render a decision on the evidence presented". An adoption of appellant's present position requires that we ignore the plain language of both the statute and the ordinance. We will consider appellant's application as he originally considered it, that is, as a request for a "special exception".

Two questions were presented to the board and the court below: (1) was the contemplated use of this site an "educational" use; if it was, (2) would the contemplated use—the establishment of a regional diocesan high school—adversely affect the health, safety and morals of the community?[7] The latter furnishes

---

[6] The statute and ordinance being in derogation of property rights recognized for centuries must be strictly construed and pursued: *Lukens v. Ridley Twp. Zoning Board*, supra, p. 612 and cases therein cited; *Medinger Appeal*, supra, p. 221; *Rolling Green Golf Club Case*, supra, p. 453.

[7] Courts have generally frowned on efforts to exclude schools from residential areas: *Catholic Bishop of Chicago v. Kingery*, 371 Ill. 257, 20 N. E. 2d 583; *Roman Catholic Archbishop v. Baker*, 140 Ore. 600, 17 P. 2d 391; *Langbein v. Bd. of Zoning Appeals*, 135

the standard which must guide both the board and the court.

The burden was not upon the appellant to establish that the proposed use would not adversely affect the health, safety, and morals of the community: *Borden Appeal,* supra, p. 521; *Root v. Erie Zoning Board of Appeals,* supra, p. 43.

The learned court below specifically set forth its reasons for the refusal of this application. These reasons were an anticipated increase of traffic with attendant dangers and hazards to the public, a change in the quiet residential character of the district with a slight depreciation in property values, expense to the township, inadequacy of the site for the school and the availability of another site for the purpose. Was the denial of the application based on these reasons a manifest abuse of discretion or erroneous as a matter of law?

The court found that the proposed use would increase traffic, which under the circumstances, would create dangers and hazards and be adverse to the public safety. In connection with this finding certain facts must be considered. The ordinance which classifies this area as an "AA" residential district specifically provides that land situated therein may be used for "educational, religious and philanthropic" purposes. The use of the land for *any* such purpose would naturally result in an increase in traffic and the framers of this ordinance certainly must have taken heed of this factor in the preparation of the ordinance. Further, the ordinance provides that in the same district a public utility building and office, (Section 301 (4)), a telephone central office or an electric-gas utility

Conn. 575, 67 A. 2d 5. Cf: *Archbishop of Detroit v. Village of Orchard Lake,* 333 Mich. 389, 53 N. W. 2d 308.

building (Section 301 (5)), could be erected without any restriction and a municipal building or railway passenger station (Section 301 (6)), could be erected with the consent of the board; *any* such uses would increase traffic far and above any increase from the use of this site for school purposes. *Any* traffic increase with its attendant noise, dirt, danger and hazards is unpleasant, yet, such increase is one of the "inevitaable accompaniments of suburban progress and of our constantly expanding population" which, *standing alone,* does not constitute a sufficient reason to refuse a property owner the legitimate use of his land: *Rolling Green Golf Club Case,* supra, p. 456. It is not *any* anticipated increase in traffic which will justify the refusal of a "special exception" in a zoning case. The anticipated increase in traffic must be of such character that it bears a *substantial* relation to the health and safety of the community. A prevision of the effect of such an increase in traffic must indicate that not only is there a likelihood but a high degree of probability that it will affect the safety and health of the community, and such prevision must be based on evidence sufficient for the purpose. Until such strong degree of probability is evidenced by legally sufficient testimony no court should act in such a way as to deprive a landowner of the otherwise legitimate use of his land. An examination of the instant record fails to reveal evidence sufficient to justify a finding that the anticipated increase in traffic bears any substantial relation to the health and safety of this community or the requisite high degree of probability that such an increase will affect adversely the health and safety of the community. The record merely indicates an anticipated minimal increase of traffic.

The court further found that the contemplated use will "change the quiet residential character of the

neighborhood and will have a *slight* damaging effect on real estate values and the entire neighborhood" (emphasis ours). What we said in *Medinger Appeal,* supra, p. 226, is particularly apposite: "We therefore hold that neither aesthetic reasons nor the conservation of property values or the stabilization of economic values in a township are, singly, or combined, sufficient to promote the health or the morals or the safety or the general welfare of the township or its inhabitants or property owners, within the meaning of the enabling Act of 1931, as amended, or under the Constitution of Pennsylvania". There is nothing in the contemplated use of this site of land by appellant which would depreciate or change the character of this neighborhood any more than would the establishment of any other school, church or philanthropic institution in the district. The conclusion reached in the court below in this respect would exclude *any* school from this district, a conclusion contrary to the language of the ordinance. No property owner is misled in this respect for every person purchasing a home site or a home in this district does so with notice contained in the ordinance that some day a school, a church or a philanthropic institution might be erected in the neighborhood.

The court finds also that the expense which would be occasioned to the township by reason of the consequent widening of streets, the placement of sidewalks and street lighting is a factor to be considered. What relationship this factor bears to the standards set forth for granting or refusing a special exception—the health, morals and safety of the community—is beyond comprehension. *Any* use of this site would affect consequently the township in that it would require the widening of streets, etc. As a matter of fact, appellant has offered of record to assume part of any attendant

expense by widening at least a portion of Royal Avenue at its own expense, providing for off-highway parking and placing sidewalks along the main artery of traffic. This reason bears no relationship to the only standards which must guide the board or the court in their exercise of discretion.

The last two reasons assigned for the denial of this application are the inadequacy of the site for the type of proposed school and the fact that appellant owns another site more suitable, in the court's opinion, for the proposed use. Neither reason furnishes an appropriate basis for the denial of this use. The Department of Public Instruction *recommends* that secondary schools have a minimum area of 10 acres with 1 additional acre for every 100 students of ultimate enrollment over a six year period. Under these recommendations the present school site of 18 acres is inadequate; an adequate site would be 26 acres. Such recommendations are not applicable to the instant situation. They are not requirements, in many instances the record indicates that even public school authorities are not following them and diocesan schools are not under and subject to the Department of Public Instruction. While it is idealistic and visionary to promulgate such recommendations concerning the adequacy of school sites, yet a court is not required to grant its imprimatur to such "ideal" plans when dealing with zoning questions. The availability of another site as a reason for the denial of a proposed use is novel in zoning cases. The fact that appellant owns another site which in the court's opinion is more suitable is irrelevant. No court is empowered to substitute its judgment for that of a multiple site owner and, in effect, direct which of several sites is to be used by him for a particular purpose. Moreover, both these reasons fall because they were not within the orbit of judicial inquiry in this matter. The

grant or refusal of this particular use does not lie within the unfettered discretion of either the board or the courts. Such discretion can only be constitutionally exercised within the standards provided in the ordinance. Unless the proposed use affects adversely the health, safety and morals of the community—the standards controlling the board's and the court's discretion—it must be allowed. To refuse a proposed use for a reason which has no substantial relationship to the standards provided by the ordinance is beyond the powers both of the board and the court and such excess of power can be corrected both on broad and narrow certiorari: *Dauphin Deposit Trust Company v. Myers*, 388 Pa. 444, 130 A. 2d 686.

An analysis of the reasons advanced by the court for denying this application indicates that the court erred in refusing to allow the proposed use. Three reasons assigned by the court—the cost to the township, the availability of another site, the inadequacy of the present site—bear no relationship to the only standards which must guide the court in the exercise of its discretion and therefore the court clearly exceeded its powers and abused its discretion in this respect. A fourth reason—the effect on the character of the neighborhood—has already been ruled by this court insufficient: *Medinger Appeal,* supra. A fifth reason—the anticipated increase in traffic—falls by reason of the fact that the evidence is insufficient to show a high degree of probability that the anticipated increase in traffic will adversely affect the health and safety of the community.

In *Lord Appeal,* 368 Pa. 121, 130, 81 A. 2d 533, quoting from the leading case of *White's Appeal,* 287 Pa. 259, 134 A. 409, it was said: " '. . . all property is held in subordination to the right of its reasonable regulation by the government *clearly necessary* to preserve

58

the health, safety or morals (or general welfare) of the people . . . . There is one matter that is quite certain, *the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety, and general welfare* . . . . While such regulations may not physically take the property, they do so regulate its use as to deprive the owner of a substantial right therein *without compensation. . . . "The right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right.* It does not owe its origin to constitutions. It existed before them. *It is a part of the citizen's natural liberty,*—an expression of his freedom, —guaranteed as inviolate by every American bill of rights": Spann v. Dallas, 111 Tex. 350, 235 S. W. 513. . . . Each case must of course be decided on its own facts.' "

In line with our duty to fully and carefully examine the reasons given by the court below for the denial of this application, and giving proper weight to the court's findings, we have carefully examined this record and are satisfied that the reasons assigned by the court for a denial of this application are not such as to justify the deprivation of appellant's right to the proposed use of his property. In refusing this application the learned court below abused its discretion, exceeded its powers and erroneously applied the law applicable in such a situation.

The language of Mr. Justice BELL in *Medinger Appeal,* supra, p. 225, is particularly applicable: "The natural or zealous desire of many zoning boards to protect, improve and develop their community, to plan a city or a township or a community that is both practical and beautiful, and to conserve the property values

as well as the 'tone' of that community is commendable. But they must remember that property owners have certain rights which are ordained, protected and preserved in our Constitution and which neither zeal nor worthwhile objectives can impinge upon or abolish".

The denial of this application would be an unnecessary, unwarranted and unreasonable intermeddling with applicant's ownership of this property under the label of the preservation of the health and safety of the community.

The order of the court below is reversed. Costs are placed on the appellee.