Taged Incorporated, a Corporation and Thomas G. Zaimes, an Individual *v.* The Zoning Board of Adjustment of the Borough of Monroeville.

Argued December 15, 1970, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and BARBIERI (who has since been appointed to the Supreme Court of Pennsylvania and did not participate in the decision).

*Leonard M. Mendelson,* for appellant.

*Richard L. Rosenzweig,* with him *Rosenzweig & Rosenzweig,* for appellee.

*Jerome M. Meyers,* with him *Meyers & Keyser,* for intervening appellee.

OPINION PER CURIAM, May 6, 1971:

The appeal in this zoning case requires us to decide whether or not a landlocked drive-in theatre operator may be denied the right to have his patrons use an access road, created by perpetual easement for ingress and regress. The lower court, after taking testimony, ruled against the drive-in theatre operator, affirming the decision of the Zoning Board. For the reasons that will appear, we reverse.

Appellants are Taged Incorporated and Thomas G. Zaimes, President of Taged Incorporated (Taged). Appellees are the Zoning Board of Adjustment of the Borough of Monroeville (Board) and Intervenors, Edward Shields and Rose Shields, his wife (Shields). The interest of Shields is as property owners of land on which they reside and which borders on the access road involved in this case. Until these proceedings began, access for theatre patrons has been over a strip of land leased from Anna Wukich (Wukich).

The following facts and circumstances are undisputed: On August 26, 1958 the theatre parcel was approved for rezoning to C-2 (commercial use) and the rezoning took place by ordinance dated September 9, 1958. On November 1, 1958 the predecessors to Taged entered into a lease for a term of 15 years for the premises in question which, as has been previously noted,

were then landlocked except for the access road easement. Taged's claim to use the access road is based upon his lease of land in the chain of title from the grantee of the easement privilege by nomination agreement from the Pennsylvania Turnpike Commission (Turnpike). The "ingress and regress" provided is by perpetual easement over land of Shields and Wukich to Northern Pike Road. There is no question raised as to Taged's right to use the easement. The question is as to the extent and character of Taged's use. The nomination agreement is dated December 1, 1955 and is attached to and forms part of the record. Its relevant terms will be noted in our subsequent discussion.

Shortly prior to November 1, 1958, when the main lease for the theatre area was executed, Taged's predecessors executed a lease for a similar term of 15 years (from November 1, 1958 to October 31, 1973) with Anna Wukich for a strip of land to be used for a theatre access route to Mosside Boulevard. At that time Mosside Boulevard was a more heavily traveled highway than Northern Pike Road and may still be. Taged or its predecessor defaulted on the lease with Wukich and Wukich has since refused to grant leases for more than a term of one year. Taged is thus subject to the uncontrolled decision of Wukich whether or not she will renew the lease which provides the present means of ingress and regress to the theatre. In addition, Wukich has pursued a practice of requiring rental increases. The rental payments include tax charges which must be paid by Taged in whatever amounts are assessed including tax increases without limit. Also there is evidence that Wukich has made it difficult or impossible to grade and otherwise deal with the tract for theatre purposes which are incident to use of the land for the entrance and exit of patrons.

On December 3, 1968, Taged applied for the exception involved herein. Urging that it found its arrange-

ment with Wukich economically unfeasible and its use of its theatre property subject to the hazard of decisions by Wukich, Taged sought leave to remove its ticket booth and marquee to the Northern Pike entrance to its access right-of-way. Certain changes had taken place with regard to the circumstances involving Taged's theatre premises between the grant of commercial zoning for theatre use by the Zoning Board in 1958 and the time when Taged applied for the right to use its access easement in 1968. During this period of approximately 10 years Taged invested some $200,000 in its theatre property. Mosside Boulevard has continued to be a major arterial highway, largely commercial in aspect, whereas Northern Pike Road which intersects Mosside Boulevard is basically residential in the area on either side of Taged's right-of-way exit, with these major exceptions: (1) Said right-of-way opens on Northern Pike directly opposite a funeral home; (2). Located approximately 400 feet East of the said right-of-way opening on Northern Pike is Monroeville Volunteer Fire Company No. 4, a fire station housing major fire fighting equipment and two ambulances; (3) The Westinghouse Electric Corporation (Westinghouse) acquired from Taged's lessors extensive holdings of land adjacent to Taged for use as a Nuclear Center. Westinghouse's acquisitions were completed in 1967 and included land for a private access road and virtually all of the land over which the theatre's access right-of-way passes. Rather than join with Taged in establishing a common right-of-way for their joint uses as an access route to and from Northern Pike, Westinghouse chose to provide its own access road over land which it now owned. Westinghouse then opposed Taged's request for official approval of its intention to use its preexisting right of access when the matter came before the Monroeville authorities for consideration. Testimony as to Taged's prospective use of the ac-

cess route varied, but this use has increased from the original 300 vehicles to 650. While there is evidence that the theatre area could be further expanded to permit the attendance of an increased number of patrons, this question as to theatre capacity is not before us on this appeal. Westinghouse's use of its access is estimated to involve traffic that would be caused by some 15,000 employes. Peak traffic periods of Taged and of Westinghouse would not coincide because Westinghouse employes would be entering and leaving in accordance with employes' schedules, whereas Taged's theatre operates at evening hours beginning between 8:30 and 9 o'clock with exiting somewhere between 1 and 2 o'clock a.m. on week days. There is also a Sunday session at which Taged has agreed to provide police traffic control at the Northern Pike access point. Other details are that Taged's use of Northern Pike and the surfacing of its access road was approved by the State Highway authorities prior to the application for the separate privilege by Westinghouse; that the State Highway Department plans are to widen Northern Pike in the area of Taged's access; and that Taged signed a release and waiver whereby Westinghouse was able to acquire from Taged's lessor certain ownership interests in the land over which it has now built its own access road; and, in return, Taged was granted a lease extension for five years until October 31, 1978.

A 1962 rezoning of the area resulted in a changed commercial use being prescribed for both the theatre area and the access road but this new form of commercial zoning is of a limited type known as "L-Special Use District", in which a drive-in theatre is not a permitted use. It is conceded, however, that Taged's use remains legal as a nonconforming use in the "L" Commercial district, and that the intervenors' residential use on the land adjacent to the right-of-way, which they claim the right to use jointly with Taged, is also

now a nonconforming use, since the "L" Commercial district also excludes residential uses. The Borough of Monroeville has agreed to install at the Westinghouse exit on the Northern Pike, at the expense of Westinghouse, a traffic control light system. The right-of-way to Northern Pike Road is 50 feet in width from the theatre parcel itself to where it passes over land previously owned by intervenors (now by Westinghouse) at which point and for a short distance to Northern Pike it is limited to the width of 20 feet as fixed by the Turnpike easement agreement.

It is not contradicted that Taged's application to the Zoning Board was for a special exception and that no request for a variance was ever made to the zoning authorities. The lower court, however, in its *de novo* handling of Taged's appeal treated the case as one in which an application for a variance was made in addition to a request for a special exception. Since it is clear to us that no question of variance has been properly raised or is subject to consideration on this appeal, the question of whether a variance could or should have been granted will not be considered.

As we have noted, the reasons advanced in support of their decisions by the Zoning Board and the lower court are not the same. Basically, the Zoning Board appeared to be ruling against a special exception "to relocate the public entrance to the theatre on Northern Pike." The denial was on the ground that the requirements for granting the exception "were not satisfied". Reasons given were: (1) the necessity for a change in the public entrance to the Theatre has not been established; (2) a lease on the Wukich property is available for the continuation of the present Theatre entrance on Moss Side Blvd.; and (3) structural alterations to the ticket booth for reasons of safety have not been ordered by a public official.

We do not pass on whether or not, or where, the ticket booth may or may not be located, but consider only the question of whether or not Taged may use the **access route** by reason of its easement right for the entrance and exit of those who patronize its theatre.

Turning now to the lower court's decision from which this appeal is taken, we find that the Court's concern is not so much with whether or not the marquee and ticket booth may be moved, but rather is almost entirely concerned with whether or not Taged may use its easement at all to provide an access road for the theatre business. We can understand this broadened scope of the lower court's consideration, since any question as to the location of the theatre's entrance facilities would be totally moot if the road could not be used by patrons. It was within this reach of the court's concern that the scope of consideration was broadened even further to include the question of variance which was not then an issue. We note further that the lower court flatly based the denial of Taged's appeal upon ". . . policies acknowledged by our Supreme Court as to the limitation and legal and reasonable termination of a nonconforming use. . . ." The court ruled that to allow the theatre to use the right-of-way would constitute a form of nonconforming use expansion not open to Taged either ". . . as lessee nor in any right they could possibly have standing in the shoes of those whom the Pennsylvania Turnpike Authority intended not to be landlocked . . .", and that the application could not ". . . possibly be accommodated on this record within any of the uses legally recognized in the pertinent zoning provisions, not as a variance, not as a special exception, not as a conditional use. . . ." In our view we need not consider many of the troublesome questions which were of deep concern to the lower court, since we hold that upon the record in this case Taged has

such property rights in the access route that the uses which it proposed to make of it cannot be denied.

First of all, the vital importance of a landowner's property right in an easement of access for ingress and regress as in this case, where his land is otherwise landlocked, is too obvious for discussion. Indeed, such an easement is so vitally important as a part of the owner's property interest in his land that the denial of the right to use it can result in the deprivation of every property right and use that attaches to his real property ownership. For a Zoning Board to deny the easement's use which is necessary to the exercise of the main use which that Zoning Board has authorized and made legally proper represents a clear abuse of discretion. Even more so do we see error in the decision of the lower court which goes beyond the question at issue, whether or not a special exception should be granted, by also ruling out an unsolicited possible grant by the Zoning Board of a variance which, as we have noted, was never raised as an issue before that Board. The existence of the access road easement has been a matter of record since it was granted in 1955, not only known to the Monroeville authorities, but known and the right-of-way actually used by the inter-venors, and known and used by Westinghouse, the present owner, which later objected to the use proposed by Taged. This publicly known property right represents a form of access route of a much higher quality than that which was authorized in *Rolling Green Golf Club Case*, 374 Pa. 450, 97 A. 2d 523 (1953).

In *Rolling Green,* our Supreme Court sustained the right of a property owner who had no easement of way but sought to build a road over its own land to connect with a public road. *Rolling Green* presents a truly striking parallel to this case. There the zoning ordinance for the district in question authorized a "railway passenger station", but permitted a golf course

only as a special exception. The golf course was not landlocked as in this case, but had a preexisting driveway for ingress and regress which it owned. It was not locked in, as Taged is in this case, except for the Wukich alternate route which could be denied or granted annually at the whim of that lessor. A striking parallel is evident between the railway station in *Rolling Green* and the Westinghouse plant in this case. Here, as in *Rolling Green,* alleged traffic problems are advanced as a basis for limiting the right to use an access road. In ruling that the refusal of the application by the golf club in *Rolling Green* was an abuse of discretion by the Zoning Board of Adjustment and that the lower court in that case had properly reversed, Mr. Chief Justice BELL (then Mr. Justice BELL) stated: "It will be noticed immediately that the zoning ordinance makes no reference to a driveway or road, but permits in this residential district the erection, alteration or use of, inter alia, (1) municipal buildings; and (2) a railway passenger station; and (3) when authorized as a special exception, a golf course. If a golf course were authorized as a special exception, no one would contend that the club could not have a driveway for purposes of ingress and egress. However, Rolling Green already has a driveway for ingress and egress opening onto State Road and the question is, can it be prohibited from building an auxiliary driveway on its new lot to connect with Northcroft Road, which is a public road and part of the Township highway system. It may not be amiss to note that if a railway passenger station were erected (as unquestionably permitted by the ordinance), experience shows that the number of automobiles going to and from the station would, in all probability, far exceed the number of automobiles which might use the golf club's proposed driveway."

Chief Justice BELL stated further: "The right of a property owner to have (or build) a road over his own

land to connect with a public road has been recognized for centuries as one of his fundamental inalienable rights. The right of ingress and egress has always been considered such an important right that the law from very early time even gave a neighbor a way of necessity *over the property of another!* See 2 Blackstone's Commentaries 35; 3 Kent Commentaries 420; Borstnar v. Allegheny County, 332 Pa. 156, 159, 2 A. 2d 715; Com. v. Burford, 225 Pa. 93, 98, 73 A. 1064. If a permit were sought for a 20-foot wide driveway on land owned and used for a private residence, the landowner's right would be so clear that no Court would consider even for a second, refusing it."

In this connection it may be noted that Shields, the intervenors, claim that their right as residents to use the access road would be interfered with by Taged's use. But their use could also become questionable under the interpretation put upon the zoning ordinance by the lower court, since, as we have noted, the ordinance provides that a residential use is not permitted in an "L" District.

Mr. Chief Justice BELL's further comments in *Rolling Green* are pertinent: "Did the present ordinance— *which must be strictly construed where it is in derogation of fundamental or common law* rights—prohibt this property owner from using part of its land for a driveway? It certainly does not say so either expressly or by clear and necessary implication and therefore it is clear that it did not intend to attempt to deprive a landowner of this important ancient fundamental right. Appellant fails to realize that this is not an application for a variance, i.e., undue or unnecessary hardship; this is not a case where a nonconforming owner wishes to extend or expand his building or plant, or to erect or use a building contrary to the terms of an ordinance. This is a case where, we repeat, a landowner wishes to construct on its own lot a 20-foot driveway

which is *nowhere prohibited* by the ordinance in question and is to be constructed in a township where, as **present and future landowners** know, the ordinance does not limit the community to private residences, but itself specifically permits buildings and uses which will produce far greater traffic and use of roads than will occur from the construction of this proposed driveway." (Emphasis added)

Reliance by the lower court and the appellees upon the Supreme Court case of *Atria, Inc. v. Mt. Lebanon Twp. Bd. of Adj.*, 438 Pa. 317, 264 A. 2d 609 (1970), in our judgment is misplaced. In that case *Atria* owned and operated a combination grocery store, beer parlor and restaurant ". . . *fronting on Beverly Road* a four-lane main arterial highway. . . ." The driveway in question was for access to the parking lot provided for the use of business patrons. As has been noted, *Atria's* property was not landlocked, but was in a zoned commercial district and fronting on a main highway. *Atria* had been operating with a rented access route to its parking lot and now sought to use for business purposes an access road to be constructed over the residential premises of one of the owners which abutted the business property in the rear, but which exited on a road in an entirely residential area. In the Court's opinion sustaining the Board's denial of the use, the late Mr. Justice Cohen pointed out that *Atria* had an alternative to the leased roadway, because it ". . . could gain vehicular access from Beverly Road *across its own commercially zoned property*. . . ." (Emphasis added) Aside from the controlling fact that the *Atria* business premises were not landlocked, there is the further difference in this case that Taged's proposed access road passes through land which not only is not zoned residential, but which is zoned commercial with the same zoning district classification as Taged's theatre area. It is suggested by appellees that *Rolling Green* was

distinguished in *Atria* and should be distinguished here, because the ordinance in *Rolling Green* did not prohibit the property owner from using part of its land for a driveway, whereas the "L" District in the instant case does prohibit such use. Aside from the fact that it is difficult to conceive of a commercial use, which "L" District provides for, without commercial access and ingress, we find no prohibition against the accessory use proposed here in any of the provisions of the Monroeville ordinance as to the "L" Special Use District. It is true that a provision is contained therein whereby the Planning Commission "may limit vehicular access by plan", but the definition of "accessory use" in Section 202 of the Ordinance contains no such prohibition as is contended for by appellees. We find nothing anywhere in the Ordinance which prohibits the use of an easement of access in connection with a legal use, specifically authorized by the Zoning authorities, and which was only rendered nonconforming by exclusion as a land use in a new form of *commercial* designation. Certainly, it is not open to any tribunal to infer any such prohibition as against the free exercise of a necessary easement, a fundamental common law property right. See *Rolling Green,* at 452-454.

We find substantial support for our conclusions in the Supreme Court case of *Young M. & W. Heb. Assn. v. Monroeville,* 429 Pa. 283, 240 A. 2d 469 (1968). In that case, the Hebrew Association applied for and was granted a "conditional use" of certain land in a "One-Family Residence" area for a nonprofit recreation project. The appeal was taken because a condition imposed upon the granting of the use was that the sole entrance and exit to the premises be by an access route which would lead out to a lane at a point close to a U. S. Steel property, whereas entrance and exit plans for access at other points on the premises in question were disapproved. The late Mr. Justice MUSMANNO,

speaking for the Supreme Court stated: "When council, in the exercise of its authority and discretion, officially decided that the plaintiff's use of its property as a recreational park was 'reasonably necessary and essential for the public convenience or welfare, and is not seriously detrimental to the character of the neighborhood', it could not then introduce a condition which nullified the use granted, by shutting the property off from public highways. With such a limitation on the 'conditional use' the council in effect made of the plaintiff's property an island and then prohibited the building of a bridge to the mainland."

In that case, the Supreme Court relied upon *Rolling Green*, quoting also from *White's Appeal*, 287 Pa. 259, one of the cases upon which the Court in *Rolling Green* relied, as follows: "In the case at bar, the borough council admits that it authorized a conditional use of the plaintiff's property. . . . Once it obtained the right to use its property for a recreational park, this right could not arbitrarily be taken away from it, even by council. The light of due process still shines, or should, in every court, legislative hall and executive chamber in America." 429 Pa. at 288.

In reversing, we simply do so on the ground that, upon the record before us, the property rights of Taged in its easement of an access road may not be abridged on the ground that a lease may continue to be available for an alternative route, as to which it has no easement or other property right, and which it may gain or lose at the uncontrolled will or fancy of the lessor in question. We do not pass upon any question concerning the location of a marquee or ticket booth should Taged choose to exercise its legal right to employ the access road in question for its business purposes. We do not pass upon whether or not a variance should be granted for some purpose beyond use for the ingress and regress of patrons of Taged's theatre operation.

In ruling as we have, we wish to note that we have examined with care all of the reasons and authorities offered by the Board and by the lower court in support of their conclusions. Counsel for the Zoning Board at the outset of the hearing before the lower court stated his conception of the result of the proceedings before the Zoning Board as follows: "The Board of Adjustment disagreed with the contention of the Appellants that the right-of-way granted for farm use could also be used for theatre use." In ruling against Taged, the lower court also attached weight to this view that the easement was intended to service only the farms which were there at the time when it was created. The suggestion appears to be that the original use when the easement was created determines and limits the availability of the easement in perpetuity. We see no merit in the view.

First of all, the "Nomination for the Use of an Access Road" executed by the Pennsylvania Turnpike Commission fixes no such limitation or any other limitation on the use as stated of a ". . . perpetual easement across the land of Edward J. Shields and Rose J. Shields, his wife, in order to provide access. . . ." It is stated simply that the Pennsylvania Turnpike nominates to the landowners in question and their assigns ". . . the free use, liberty and privilege of and passage in and along an access road. . . ." Even if there were such a limitation, however, the claim to maintain such a status when other areas surrounding the parcel of land in question had been legally changed with the march of progress may not be sustained. See *Archbishop O'Hara's Appeal*, 389 Pa. 35, 131 A. 2d 587 (1957). Particularly is a claim to maintain the alleged farm use limitation logically untenable when advanced by the Zoning Board which had authorized the theatre operation and other major nonfarming uses. The zoning authorities themselves ordained and are responsible

for changing the character of the land to be served by the access road and the easement thereto, thereby changing of necessity the kind of ingress and regress that would thenceforward be running with the land.

While the lower court discusses the alleged traffic problem as if the use of Taged's easement would create such a problem, the record indicates that the major problem is envisioned during regular peak traffic hours and in conjunction with new traffic created by the Westinghouse outlet onto Northern Pike. While it is urged that the drive-in theatre traffic would add to this new traffic, it is not explained how this can happen with Taged's traffic hours when they are. As we have noted, these hours are at night and on Sunday when Westinghouse traffic should be minimal. Also, Taged's theatre operation is seasonal, running from April to November, with the higher patron use only in the summer months.

If the Monroeville authorities and Westinghouse envision problems due to additional traffic caused by Taged's use of its access road, such problems are clearly self-inflicted*, resulting from their refusal to recognize Taged's rights and acting in disregard of them.

Accordingly, the order of the Court of Common Pleas is reversed, and the order of the Board is vacated and the record remanded for disposition consistent with this Opinion.

---

* Appellee's own expert witness recommended to the Borough that Westinghouse and Taged use "a common drive", but Westinghouse's objection to this was sustained by the Borough authorities. (216a, 224a)